JOSEPH STERNBERG et al., Individually and on Behalf of All Others Similarly Situated, Respondents, and RICHARD D. OSTOR, Respondent-Appellant, v CITICORP CREDIT SERVICES, INC., et al., Appellants-Respondents.

Second Department, August 6, 1979

### APPEARANCES OF COUNSEL

*Shearman & Sterling (Andrew S. O'Connor* and *George J. Wade* of counsel), for appellants-respondents.

*Kass, Goodkind, Wechsler & Labaton (Jonathan M. Plasse, Robert S. Schachter* and *Stuart D. Wechsler* of counsel), for Joseph Sternberg, respondent.

*Elder & Walsky (Mark J. Elder* and *Lance S. Walsky* of counsel), for respondent-appellant.

*Sheldon V. Burman* for Robert P. Shaftan, respondent.

### OPINION OF THE COURT

SHAPIRO, J.

■ The central issue raised on this appeal is whether article 10 of the Personal Property Law permits defendant Citicorp Credit Services, Inc., a financing agency, to impose a 50-cent minimum monthly finance charge upon its Citibank Master Charge cardholders who made at least one purchase during a "billing cycle" in which there was: (a) no prior balance; or (b) a prior balance that was paid within 25 days of the billing

date. Special Term answered that question in the negative.[1] We agree.

Citibank, N. A. (Citibank) and its subsidiary Citicorp Credit Services, Inc. (CCSI) maintain a Master Charge account relationshp with several hundred thousand cardholders. The terms of their relationship are governed by the provisions of article 10 of the Personal Property Law, commonly known as the Retail Instalment Sales Act, and the CCSI retail installment credit agreement. Under the Citibank Master Charge program, when CCSI acquires charges for purchases made by a cardholder it posts them (as debits) to his account. It then submits a bill to him approximately once each month reflecting those purchases. The monthly period covered by a Master Charge bill is referred to as the "billing cycle".

Beginning in October, 1975, CCSI contracted with its cardholders under the Retail Instalment Sales Act for the payment by them of a minimum finance charge of 50 cents. That charge was to be added to the cardholder's purchases account at the end of any billing cycle in which there was a balance in the account at the beginning of the billing cycle which was not paid within the first 25 days of the billing cycle.

In a special mailing announcement dated April 5, 1976, CCSI announced a modification of the retail installment credit agreement and that modification is the subject matter of this suit. Its cardholders were notified that the circumstances under which the 50 cents would be charged were being changed to broaden the application of the minimum finance charge to include those situations in which there was at least one purchase during the billing cycle even though the amount due was paid within the first 25 days of the billing cycle. Thus, the April, 1976 modification of the minimum finance charge resulted in a finance charge which would not have been imposed

1. This action was commenced by plaintiff Joseph Sternberg in April, 1976 and was certified as a class action on November 5, 1976. Subsequently, actions commenced by plaintiffs Robert Shaftan and Richard D. Ostor were consolidated into the Sternberg action by orders dated February 18, 1977 and July 12, 1977, respectively. On or about May 9, 1977, Sternberg and Shaftan served the defendants with certain joint discovery requests to which the defendants did not respond. By notice of motion dated November 30, 1977, the plaintiffs moved for an order to compel disclosure and the defendants cross-moved for summary judgment. Special Term granted summary judgment to the plaintiffs.

under the October 1, 1975 retail installment credit agreement where: (1) the new balance, i.e., the balance as of the billing date, was zero or was paid down to zero during the first 25 days of the billing cycle; and (b) there was at least one purchase during the billing cycle.

The modification became effective with the cardholder's next billing cycle in May, 1976 and was reflected in the statement for that period. The effect of the modification may be simply illustrated. Assume that a particular cardholder's billing cycle began on the 16th day of each month and ended on the 15th day of the following month. Assume further that on May 16, 1976, the cardholder's balance in his purchases account was $100, that the cardholder made an additional purchase of $50 on May 25, 1976, and made a payment of $100 to CCSI on May 31, 1976. Under the CCSI retail installment credit agreement in effect prior to the April, 1976 modification, the billing statement rendered as of June 15, 1976 would not reflect a finance charge for the May 16 to June 15 billing cycle, because the opening balance in the purchases account was paid within the first 25 days of the billing cycle. However, under the April, 1976 modification, the June 15 statement would reflect a 50-cent finance charge in respect to the May 16 to June 15 billing cycle, as a result of the purchase during that period.[2]

In his determination at Special Term, Mr. Justice DI PAOLA directed summary judgment in favor of the plaintiffs holding that the minimum 50-cent finance charge collected by Citicorp from holders of Citibank Master Charge cards between June, 1976 and January 11, 1978 was unlawful, and he directed that those sums be refunded by defendants.

### THE LAW

The relevant provision of the Retail Instalment Sales Act which governs retail installment credit agreements, more commonly known as revolving credit agreements, is section 413 of the Personal Property Law. Paragraph (a) of subdivision 11 of that section provides that a financing agency such as CCSI may, in a retail installment credit agreement: "contract for, and if it has so contracted and delivered to the buyer a copy of the credit agreement executed by it, may charge,

---

2. This practice originated by the April, 1976 modification was voluntarily discontinued by CCSI on January 11, 1978.

receive and collect the service charge authorized by this section * * * if the service charge so authorized is computed on the buyer's total *outstanding indebtedness* * * * *from month to month* to be paid in accordance with [the] retail installment credit agreement" (emphasis supplied).

The maximum service charge authorized by section 413 (subd 11, par [a]) is set forth in subdivision 3 of section 413 which provides, in pertinent part:

"A seller may, in a retail instalment credit agreement, contract for and, if so contracted for, the seller or holder thereof may charge, receive and collect the service charge authorized by this article. The service charge shall not exceed the following rates computed, for the purposes of this section, *on the outstanding indebtedness* from month to month:

"(a) On so much of the outstanding indebtedness as does not exceed five hundred dollars, one and one-half per centum per month;

"(b) If the outstanding indebtedness is more than five hundred dollars, one per centum per month on the excess over five hundred dollars of the outstanding indebtedness; or

"(c) If the service charge so computed is less than seventy cents for any month, seventy cents" (emphasis supplied).

Those provisions, as in effect during the time period in issue,[3] make it clear that a service charge may only be computed on a cardholder's "outstanding indebtedness from month to month" arising from purchases made pursuant to the retail installment credit agreement. The statute is equally clear that the *minimum* finance charge authorized by section 413 (subd 3, par [c]), which CCSI relies upon to justify its 50-cent minimum monthly charge, is subject to the same month-to-month indebtedness requirement.

Defendants argue that Special Term erred in its determination that CCSI's 50-cent minimum finance charge violated subdivision 3 of section 413 of the Personal Property Law because the fee was not based on the cardholder's "outstanding indebtedness from month to month". The asserted error is based upon two premises: (1) Special Term failed to recognize that under the "average daily balance" method of computing finance charges, as used by CCSI, an average outstanding

---

**3.** The subject of this action concerns the imposition of a service charge during a period prior to the amendment of subdivision 3 of section 413 of the Personal Property Law (L 1977, ch 317, eff Jan. 1, 1978).

balance is necessarily generated by any opening balance, regardless of whether it is paid during the billing cycle; and (2) Special Term erroneously concluded that a cardholder is not indebted to CCSI in respect to purchases theretofore made until CCSI requests payment by sending a monthly statement reflecting those purchases to the cardholder.

Under the "average daily balance" method of computing finance charges, utilized by CCSI, the balances on each day of the billing cycle are totaled and divided by the number of days in the billing cycle to determine the "average daily balance" for the applicable month. The finance charge is calculated by multiplying the average daily balance by the appropriate percentage. (See *Zachary v Macy & Co.,* 31 NY2d 443, 453, discussed *infra.*) Accordingly, whenever there is an outstanding balance at the beginning of a billing cycle arising from purchases during the prior billing cycle, or where there is a purchase during the current billing cycle, it is a mathematical certainty that there will be an average daily balance for the current billing cycle. It is this "outstanding indebtedness" which CCSI imposed a finance charge upon as an indebtedness outstanding from month to month.

The sole relevant decision which I have found defining "outstanding indebtedness from month to month" is *Zachary v Macy & Co.* (31 NY2d 443, *supra).* In *Zachary,* the court upheld the legality of the "previous balance" financing method in which service charges on a cardholder's purchase account in a monthly billing cycle were deferred until the close of the succeeding billing cycle. Until that time, and in contrast to the credit agreement at bar, a cardholder was permitted to make full payment to avoid the imposition of credit charges. Within this context, the court reasoned that "the term 'outstanding indebtedness', in its ordinary sense denotes only the amount 'owing or unpaid' " at some particular point in time (p 455). The court went on to state that " 'outstanding indebtedness from month to month' merely requires that finance charges be computed at consistent monthly intervals on the customer's outstanding indebtedness at that time" (p 461).

Applying *Zachary* to the facts here, the CCSI 1976 modification must be held invalid. If the balance in a cardholder's account at the beginning of a billing cycle is paid within the first 25 days of the cycle, as provided in the 1976 agreement, there is no month-to-month outstanding indebtedness upon

which the service charge can be imposed. Such an interpretation is consistent with subdivision 8 of section 401 of the Personal Property Law, which defines retail installment credit agreement as an agreement in which "the buyer promises to pay, in instalments, his outstanding indebtedness from time to time". The statute is clear and unambiguous and we should construe and apply it according to its terms (see McKinney's Cons Laws of NY, Book 1, Statutes, § 231; *United States v Shreveport Grain & Elevator Co.,* 287 US 77, 83). The fact that a cardholder makes a purchase during a billing cycle in which there is an opening balance does not entitle a financing agency to impose a finance charge since there is at that time no installment yet due and unpaid.

An example to illustrate the soundness of that conclusion may be profitable. Let us assume that a given billing cycle has a zero opening balance and corresponds roughly to the calendar months. A $100 purchase is made in January and the cardholder is billed in that amount at the close of the billing cycle. This $100 debit is now the opening balance in the succeeding February billing cycle. Where full repayment is made within the first 25 days of the February cycle, the indebtedness is discharged during that period of time which corresponds to the January billing cycle as set forth under the 1976 agreement. Accordingly, this indebtedness has not been "carried" over into the succeeding February cycle and is therefore not outstanding on a month-to-month basis. Stated in the negative, where a purchase is made in January and full repayment is made on February 26, one day after the January payment period expires, this indebtedness will appear on the billing statement which corresponds to the February indebtedness. At this point, the indebtedness has been outstanding from month to month and a minimum service charge is authorized by section 413 of the Personal Property Law.

The month-to-month billing system as described above is akin to the method which the Court of Appeals upheld in *Zachary* (31 NY2d 443, *supra).* Under that plan, an indebtedness which is incurred in the January cycle is reflected in the closing statement for that period. The cardholder has until the close of the succeeding February billing cycle in which to make payment on that indebtedness. If he fails to make full repayment within that time, a finance charge is imposed. This practice is permissible under the statute because the indebtedness has been carried over into the succeeding February

monthly billing period as provided in the applicable retail installment credit agreement. Bearing that fact in mind, it becomes evident that where a cardholder timely pays the opening balance before the end of a given billing cycle the average daily balance accounting method has no effect on whether an indebtedness is outstanding from month to month. In such circumstances there is no outstanding indebtedness to be used in computing an average daily balance which, when multiplied by the appropriate fixed statutory percentage, will yield the net finance charge. The court in *Zachary* was called upon to examine these financing methods in depth because the issue in that case was whether the defendants' previous balance accounting method resulted in charges on amounts in excess of the actual outstanding indebtedness and in excess of the maximum 18% return allowable by statute. We are not burdened by that issue and our analysis should not be clouded by it.

Defendants contend that under the reasoning of Special Term's decision a finance charge could not be imposed where full payment of an opening balance is made on the 26th day of the billing cycle. As a result, the argument continues, Special Term would apparently hold that all commonly used retail installment credit agreements (which provide a 25-day grace period for repayment) would violate section 413. This argument fails because the time period designated by a financing agency in which payments are attributable to a given monthly cycle, and after which the indebtedness is carried forward into the succeeding cycle, does not affect the requirements of section 413 of the Personal Property Law. This period may vary; the issue under the statute is whether the indebtedness has been outstanding month to month under the applicable retail installment credit agreement.

In a related argument, defendants claim that Special Term's decision ignores the fact that a cardholder becomes indebted to CCSI at the time it posts the charge to the cardholder's account, rather than when the monthly billing statement is issued. It is defendants' contention, in that regard, that an indebtedness is in fact outstanding from the date a cardholder's charge is posted even though the date for payment has not yet arrived and the indebtedness is paid when it is due. Under their theory an indebtedness will always be outstanding from month to month since purchases in any given monthly cycle will not be billed and payable until at least the

beginning of the succeeding monthly cycle. I do not believe that the Legislature could have intended such a result. Under defendants' theory, if purchases during a point in the January billing cycle were, under a different system, billed six months later at the end of the July cycle, the indebtedness would have been outstanding for six months even though during that period the customer was not in default. To say the least, the contention appears unreasonable and illogical.

Our holding that the CCSI service charge is illegal accords with the intention of the Legislature to provide protection for consumers in retail installment credit transactions. Governor Harriman stated, in connection with the installment sales regulations laws (NY Legis Ann, 1957, pp 503-504):

"These six bills relating to the regulation and supervision of instalment sales mark one of the greatest advances in the history of the State in the field of consumer protection * * *

"The act sets ceilings, for the first time, on instalment credit charges * * * In addition, any services given and charged for on a revolving credit plan are included. This is the first time that 'revolving credit,' which is being used increasingly by department stores, has been legally identified and brought under public control * * *

"The measures, taken together, constitute a package which will prove to be of real benefit to the consumers of our state."

■■ The remedial nature of the statute requires that it be liberally construed in order to carry out its intended purposes and reforms (see McKinney's Cons Laws of NY, Book 1, Statutes, § 321) and interpreted "in the interests of those whose rights are to be protected", namely, the consumer (see *Van Kannel Revolving Door Co. v Astor,* 119 App Div 214, 219). Accordingly, to sanction a practice in which monthly billing charges may be imposed upon a cardholder who has promptly and within the specified time fully paid his indebtedness would defeat the act's primary purpose of protecting the consumer from unconscionable advantage. We decline to validate such a practice.[4]

---

4. ■ The second issue raised on this appeal is whether plaintiff Ostor's cause of action for common-law fraud was properly dismissed for lack of merit. The basis of his claim is the alleged knowing misrepresentation by CCSI to Ostor and the plaintiff class concerning their obligation to pay the 50-cent finance charge under the terms of the 1976 agreement. By affidavit sworn to February 21, 1978, Ostor admitted that he did not believe he was obligated to pay CCSI's minimum finance charge. Since there was no reliance on the alleged misrepresentation, there can be no fraud action. The

Accordingly, the order and judgment appealed from should be affirmed.

LAZER, J. P., RABIN and GULOTTA, JJ., concur.

Order and judgment (one paper) of the Supreme Court, Nassau County, dated September 14, 1978, affirmed, with one bill of $50 costs and disbursements to plaintiffs Sternberg and Shaftan, payable by defendants.

---

single instance in which Ostor alleges he was charged two minimum finance charges in a single billing statement, which resulted in his mistaken payment of one of these charges, does not alone support an inference of fraud rather than mere clerical error. Moreover, any reliance by Ostor on this single occurrence raises serious questions about the propriety of his representing a class which was allegedly defrauded via defendants' misrepresentations and not as a result of a "double billing". (See CPLR 901; cf. *Strauss v Long Is. Sports,* 60 AD2d 501.)