# AMERICAN EXPRESS CO. *v.* KOERNER

No. 80–202.   Argued April 20, 1981—Decided June 8, 1981

BLACKMUN, J., delivered the opinion for a unanimous Court.

*Ronald J. Greene* argued the cause for petitioner. With him on the briefs were *Arnold M. Lerman* and *Peter Frank Liberto.*

*Louis R. Koerner, Jr.,* argued the cause and filed a brief for respondent.

JUSTICE BLACKMUN delivered the opinion of the Court.

The question presented is whether a creditor must follow the requirements specified in 1974 by the Fair Credit Billing Act, Pub. L. 93–495, Tit. III, 88 Stat. 1511, for the correction of billing errors, when both a corporation and an individual officer are liable for a debt.

## I

The Fair Credit Billing Act added a number of provisions to the Truth in Lending Act (TILA), Pub. L. 90–321, Tit. I, 82 Stat. 146. A primary provision, and the one at issue in this case, is § 161 (a), as so added. 88 Stat. 1512, 15 U. S. C. § 1666 (a).[1] This section applies whenever a creditor trans-

---

[1] Section 161 (a) provides:

"If a creditor, within sixty days after having transmitted to an obligor a statement of the obligor's account in connection with an extension of

mits to an obligor "a statement of the obligor's account in connection with an extension of consumer credit." If the

consumer credit, receives at the address disclosed under section 127 (b) (11) a written notice (other than a notice on a payment stub or other payment medium supplied by the creditor if the creditor so stipulates with the disclosure required under section 127 (a) (8)) from the obligor in which the obligor—

"(1) sets forth or otherwise enables the creditor to identify the name and account number (if any) of the obligor,

"(2) indicates the obligor's belief that the statement contains a billing error and the amount of such billing error, and

"(3) sets forth the reasons for the obligor's belief (to the extent applicable) that the statement contains a billing error,

the creditor shall, unless the obligor has, after giving such written notice and before the expiration of the time limits herein specified, agreed that the statement was correct—

"(A) not later than thirty days after the receipt of the notice, send a written acknowledgement thereof to the obligor, unless the action required in subparagraph (B) is taken within such thirty-day period, and

"(B) not later than two complete billing cycles of the creditor (in no event later than ninety days) after the receipt of the notice and prior to taking any action to collect the amount, or any part thereof, indicated by the obligor under paragraph (2) either—

"(i) make appropriate corrections in the account of the obligor, including the crediting of any finance charges on amounts erroneously billed, and transmit to the obligor a notification of such corrections and the creditor's explanation of any change in the amount indicated by the obligor under paragraph (2) and, if any such change is made and the obligor so requests, copies of documentary evidence of the obligor's indebtedness; or

"(ii) send a written explanation or clarification to the obligor, after having conducted an investigation, setting forth to the extent applicable the reasons why the creditor believes the account of the obligor was correctly shown in the statement and, upon request of the obligor, provide copies of documentary evidence of the obligor's indebtedness. In the case of a billing error where the obligor alleges that the creditor's billing statement reflects goods not delivered to the obligor or his designee in accordance with the agreement made at the time of the transaction, a creditor may not construe such amount to be correctly shown unless he determines that such goods were actually delivered, mailed, or otherwise

obligor believes that the statement contains a billing error,[2] he then may send the creditor a written notice setting forth that belief, indicating the amount of the error and the reasons supporting his belief that it is an error. If the creditor receives this notice within 60 days of transmitting the statement of account, § 161 (a) imposes two separate obligations upon the creditor. Within 30 days, it must send a written acknowledgment that it has received the notice. And, within 90 days

---

sent to the obligor and provides the obligor with a statement of such determination.

After complying with the provisions of this subsection with respect to an alleged billing error, a creditor has no further responsibility under this section if the obligor continues to make substantially the same allegation with respect to such error."

[2] "Billing error" is defined in § 161 (b), 88 Stat. 1513, 15 U. S. C. § 1666 (b):

"For the purpose of this section, a 'billing error' consists of any of the following:

"(1) A reflection on a statement of an extension of credit which was not made to the obligor or, if made, was not in the amount reflected on such statement.

"(2) A reflection on a statement of an extension of credit for which the obligor requests additional clarification including documentary evidence thereof.

"(3) A reflection on a statement of goods or services not accepted by the obligor or his designee or not delivered to the obligor or his designee in accordance with the agreement made at the time of a transaction.

"(4) The creditor's failure to reflect properly on a statement a payment made by the obligor or a credit issued to the obligor.

"(5) A computation error or similar error of an accounting nature of the creditor on a statement.

"(6) Any other error described in regulations of the Board."

Like many other provisions of the TILA, § 161 (b) was amended in 1980 by the Truth in Lending Simplification and Reform Act, Pub. L. 96–221, Tit. VI, 94 Stat. 168. Because the effective date of these amendments is April 1, 1982, see § 625 (a) of the 1980 Act, 94 Stat. 185, and because the changes made in the TILA by these amendments are of no consequence to the issue presented by the present case, we cite only the currently effective provisions of the TILA throughout this opinion.

or two complete billing cycles, whichever is shorter, the creditor must investigate the matter and either make appropriate corrections in the obligor's account or send a written explanation of its belief that the original statement sent to the obligor was correct. The creditor must send its explanation before making any attempt to collect the disputed amount.

A creditor that fails to comply with § 161 (a) forfeits its right to collect the first $50 of the disputed amount including finance charges. § 161 (e), 15 U. S. C. § 1666 (e). In addition, § 161 (d) provides that, pursuant to regulations of the Federal Reserve Board, a creditor operating an "open end consumer credit plan" may not restrict or close an account due to an obligor's failure to pay a disputed amount until the creditor has sent the written explanation required by § 161 (a).

Every creditor under an "open end consumer credit plan" must disclose the protections available under § 161 to the obligor. This disclosure must occur at the time the account is opened and at semiannual intervals thereafter. See § 127 (a)(8), 15 U. S. C. § 1637 (a)(8).

## II

This case presents a dispute over the applicability of § 161. The relevant facts, as the District Court noted, are largely undisputed. On November 16, 1965, prior to the enactment of the TILA, John E. Koerner & Co., Inc., applied for a credit card account with petitioner American Express Company. The application was for a "company account" designed for business customers. App. 27a. The Koerner Company asked American Express to issue cards bearing the company's name to respondent Louis R. Koerner, Sr., and four other officers of the corporation. Respondent was required to sign a "company account" form, agreeing that he would be jointly and severally liable with the company for all charges incurred through the use of the company card that was issued to him. *Id.*, at 28a. American Express, before issuing the cards, in-

vestigated the company's credit rating, but not that of respondent or the other officers.

American Express billed the Koerner Company for all charges arising from the use of the five cards issued for the company account. It sent a monthly statement showing the total due and listing individual subtotals for each of the five users. Although respondent employed his card mostly for business-related expenses, he used it occasionally for personal expenses. When he did so, he paid for these items by sending his personal check to American Express. Charges for his business-related expenses were paid by the company.

In 1975, a dispute arose between the Koerner Company and American Express concerning charges that appeared on the company account. American Express had billed the company for flight insurance for three business trips made by company employees, and for renewal fees for two of the cards that the company claimed were no longer desired. The total amount in dispute, which the company refused to pay, was $55. Company officials wrote to American Express several times about this. The record does not indicate that American Express responded in any way prior to November 1976.[3]

On September 28, 1976, respondent attempted to use his card to purchase a plane ticket for a business trip. After getting in touch with American Express, the ticket agent requested that respondent speak by telephone with an American Express employee. This employee informed respondent that the account was canceled because of delinquency in payment. She instructed the ticket agent to cut respondent's card in two and return it to him.

Shortly thereafter, respondent filed this action in the United States District Court for the Eastern District of Louisiana. He alleged that American Express had canceled the

---

[3] Although the record is unclear, American Express apparently credited the account in the amount of $54.45 on November 26, 1976, leaving a balance of 55 cents. App. 41a.

account because of the Koerner Company's refusal to pay the disputed charges and in retaliation for the many complaints that had been made by the company in its attempt to resolve the dispute. Jurisdiction was based upon § 130 of the TILA, 15 U. S. C. § 1640, which provides for the recovery of actual damages sustained by any person as the result of a creditor's failure to comply with various provisions of the TILA, including § 161, and grants jurisdiction of such actions to the federal district courts. The complaint sought damages of $25,000 for "inconvenience, mental anguish, grief, aggravation, and humiliation." App. 20a.[4] Respondent, invoking diversity jurisdiction, also sought damages under Louisiana law.

The District Court granted American Express' motion for summary judgment. 444 F. Supp. 334 (1977). It held that both § 161, which applies only to "an extension of consumer credit," and § 104 (1), 15 U. S. C. § 1603 (1), which exempts "[c]redit transactions involving extensions of credit for business or commercial purposes" from most of the provisions of the TILA,[5] required the conclusion that the procedures established by § 161 do not apply to an account opened in the

---

[4] Respondent also sought to represent a class composed of persons and organizations who held American Express cards or would do so in the future, and a subclass composed of all those cardholders who had attempted to utilize the provisions of § 161 and had been injured by American Express' violations of that section. On behalf of these classes, he sought injunctive relief and damages. Respondent, however, did not obtain certification of a class pursuant to Federal Rule of Civil Procedure 23 (c) prior to the District Court's decision.

[5] By § 135 of the TILA, as added by Pub. L. 93–495, § 410 (a), 88 Stat. 1519, 15 U. S. C. § 1645, Congress provided that the business purpose exemption in § 104 (1) is generally not applicable to § 132, 15 U. S. C. § 1642 (prohibiting the issuance of unsolicited credit cards), to § 133, 15 U. S. C. § 1643 (limiting a cardholder's liability for unauthorized use of a card to $50), and to § 134, 15 U. S. C. § 1644 (imposing criminal penalties for various offenses involving credit cards).

name of a corporation in reliance upon the corporation's credit.[6]

The United States Court of Appeals for the Fifth Circuit reversed. 615 F. 2d 191 (1980). Noting that respondent was jointly and severally liable with the company for all debts incurred by his use of the card, the court concluded: "If [American Express] can recover from a consumer, then it must abide by the requirements of [§ 161] for correction of billing errors in a consumer's credit card statement. The credit card company cannot have it both ways . . . ." *Id.*, at 195.

Because of the significance of the issue in the enforcement of the TILA, we granted certiorari. 449 U. S. 1076 (1981).

## III

The threshold inquiry under § 161 (a) is whether the creditor has transmitted to an obligor "a statement of the obligor's account in connection with an extension of consumer credit." If there has been no extension of "consumer credit," the section imposes no obligation upon a creditor, and the creditor is free to adopt its own procedures for responding to a customer's complaint about a billing error. We conclude that, on the undisputed facts of this case, respondent has failed to show that American Express has extended him "consumer credit" in any relevant transaction. Section 161 (a), therefore, is not applicable to the dispute between these parties.[7]

In order for there to be an extension of consumer credit,

---

[6] Respondent conceded that his claims under state law, for which he had invoked diversity jurisdiction, did not satisfy the amount-in-controversy requirement of 28 U. S. C. § 1332. See 444 F. Supp., at 335, n. 1, and 342.

[7] In view of our reliance upon § 161 (a)'s use of the term "consumer credit," we have no occasion to address petitioner's broader argument that all the provisions of the TILA, except those mentioned in § 135, 15 U. S. C. § 1645, are inapplicable to the Koerner Company's account because of the exemption for credit extended for business or commercial purposes contained in § 104 (1), 15 U. S. C. § 1603 (1).

there first must be an extension of "credit." The TILA's definition of "credit" is contained in § 103 (e), 15 U. S. C. § 1602 (e): "The term 'credit' means the right granted by a creditor to a debtor to defer payment of debt or to incur debt and defer its payment." [8] Thus, a credit card company such as American Express extends credit to an individual or an organization when it opens or renews an account, as well as when the cardholder actually uses the credit card to make purchases. When the account is opened or renewed, the creditor has granted a right "to incur debt and defer its payment"; when the card is used, the creditor has allowed the cardholder "to defer payment of debt."

An extension of credit is an extension of "consumer credit" if the conditions specified in the statute's definition of "consumer" are also satisfied. Section 103 (h) of the TILA, 15 U. S. C. § 1602 (h), defines "consumer" as follows:

> "The adjective 'consumer,' used with reference to a credit transaction, characterizes the transaction as one in which the party to whom credit is offered or extended is a natural person, and the money, property, or services which are the subject of the transaction are primarily for personal, family, household, or agricultural purposes."

Two elements thus must be present in every "consumer credit" transaction: the party to whom the credit is extended must be a natural person, *and* the money, property, or services received by that person must be "primarily for personal, family, household, or agricultural purposes." [9] We therefore conclude that the Court of Appeals erred in holding respondent to be a "consumer" without deciding whether American

---

[8] It is undisputed that American Express is a "creditor," as defined in § 103 (f) of the TILA, 15 U. S. C. § 1602 (f). The term "debtor" is not defined in the Act, but American Express does not contend that respondent is not a "debtor."

[9] We hereinafter use the phrase "consumer purposes" as the equivalent of "personal, family, household, or agricultural purposes."

Express had extended him credit primarily for any of the purposes specified in § 103 (h). If it had considered this issue, the only permissible conclusion for it to reach would have been that the undisputed facts of this case establish that the threshold requirement of § 161 (a)—an "extension of consumer credit"—has not been satisfied because none of the credit transactions relevant to the billing dispute was entered into "primarily" for consumer purposes.

The language of § 161 (a) does not distinguish between the two types of transactions included in the definition of "credit" or indicate which of them must satisfy the definition of "consumer" in order for the section to be applicable. There are several possibilities. The relevant extension of credit may be only the creation or renewal of the account. Under this view, adopted by the District Court, 444 F. Supp., at 340, if an account is opened by a natural person, its overall purpose must be considered. If the account is opened primarily for consumer purposes, § 161 (a) applies, even if the cardholder uses the card for an occasional nonconsumer purchase. On the other hand, the language might be interpreted to call for a transaction-by-transaction approach. With such an approach, § 161 would apply if the transaction that is the subject of the dispute is a consumer credit transaction, regardless of the overall purpose of the account. A third alternative would be to combine the two approaches by holding § 161 applicable to all disputes that arise under an account that is characterized as a consumer credit account as well as to any dispute concerning an individual transaction that is an extension of consumer credit, even if the overall purpose of the account is primarily a business one.

We need not choose among these alternatives in order to decide this case,[10] for we find that respondent is unable to

---

[10] It is clear that some consideration of the overall purposes of a credit card account, not merely of individual transactions, is necessary under § 161. For example, the application of § 161 (a) to some of the billing

succeed under any of them. The undisputed facts of this case reveal that the Koerner Company obtained the right "to incur debt and defer its payment" from American Express

---

errors specified in § 161 (b) is possible only when the credit card account itself is classified as an extension of consumer credit. This is because these errors (charges for extensions of credit that never were made, failure to reflect payments made by the obligor, and errors in computation) do not arise from a particular use of a credit card. Furthermore, provisions such as § 161 (d), which prohibits a creditor that operates "an open end consumer credit *plan*" (emphasis added) from closing or restricting an account unless it has complied with § 161 (a), and § 127 (a) (8), which requires creditors to disclose the protections available under § 161 (a) "[b]efore opening any account under an open end consumer credit *plan*" (emphasis added), as well as twice a year after the account is opened, clearly are applicable only if the account itself (the "plan") is an extension of consumer credit.

We are hesitant, however, to preclude completely the possibility of a transaction-by-transaction approach to § 161 (a). Regulation Z of the Federal Reserve Board includes detailed rules applying § 161 (a), and the regulation is entitled to substantial deference. *Anderson Bros. Ford* v. *Valencia, ante,* at 219; *Ford Motor Credit Co.* v. *Milhollin,* 444 U. S. 555 (1980); *Mourning* v. *Family Publications Service, Inc.,* 411 U. S. 356 (1973). The scope of the rules implementing § 161 is stated in 12 CFR § 226.14 (g) (1980):

"This section does not apply to credit other than open end [a term defined to include only consumer credit, see 12 CFR § 226.2 (x) (1980)], whether or not a periodic statement is mailed or delivered, unless it is consumer credit extended on an account by use of a credit card."

The reference to "consumer credit extended on an account by use of a credit card" seems to indicate that a dispute concerning any transaction involving the use of a credit card by a natural person for consumer purposes may be subject to the requirements of § 161 (a).

We are aware that the Federal Reserve Board recently has promulgated a complete revision of Regulation Z, 46 Fed. Reg. 20847 (Apr. 7, 1981), and that the statement accompanying the revision indicates that "cards issued for non-consumer credit purposes are covered only by the provisions regarding credit card issuance and liability." *Id.,* at 20850. See also 45 Fed. Reg. 80648, 80651 (1980) (statement accompanying the proposed rules) ("[W]hen a card is issued for business purposes, the fact that an individual uses it for consumer purposes does not subject the card issuer to the provisions on periodic statements, billing error resolution, and other

primarily for business, not consumer, purposes. In addition, the specific transactions that were the subject of the dispute between the company and American Express also were business transactions. The facts of this case, therefore, are not encompassed within any possible interpretation of the phrase "extension of consumer credit" in § 161 (a).

The overall purpose of the Koerner Company's account is clear, and respondent has not claimed that the company sought its account with American Express primarily for consumer purposes. Rather, the company applied for a "company account" using a form supplied by American Express for such an account. App. 27a. Respondent's separate application for a supplementary credit card for the same account also was submitted on a company account form. *Id.*, at 28a. The only credit references submitted to American Express on these forms were those of the Koerner Company, and respondent has admitted that the account was billed to the Koerner Company as a business account. *Id.*, at 25a and 30a. We agree with the District Court that this evidence is sufficient to indicate that the account was opened primarily for business or commercial purposes. See 444 F. Supp., at 340. The evidence submitted by respondent does not weaken this conclusion. In fact, it confirms it. Respondent admitted that he used the card mostly for business purposes.[11] His answers to petitioner's interrogatories identified no more than seven nonbusiness uses of the card between 1972 and 1976. App. 42a–43a.[12]

---

consumer protections"). For the reasons stated in the text, however, we need not decide whether the 1981 revision applies retroactively to this case, whether it conflicts with the earlier version of the regulations, or whether it is valid if it does conflict. Regardless of how we were to answer these questions, respondent cannot succeed on the merits.

[11] Memorandum in Support of Plaintiff's Motion for New Hearing and to Alter or Amend Judgment and/or for New Trial 1–2, Record 158–159.

[12] American Express included the billing records of the account for the period June 1975 to August 1976 (excluding February 1976), as Exhibit

We do not suggest that it always will be easy to determine whether the opening of a credit account involves an extension of consumer credit. The Court of Appeals noted that often it is difficult to characterize the overall purpose of a credit card account that allows for a large number of individual transactions. 615 F. 2d, at 195.[13] It is clear, however, that the Fair Credit Billing Act requires creditors and the courts to undertake this task. See n. 10, *supra*. On this record, there can be no dispute that the Koerner Company's account was not covered by § 103 (h)'s definition of "consumer," because it was not opened "primarily for personal, family, household, or agricultural purposes."

Similarly, the transactions that were the subject of the underlying dispute cannot be characterized as extensions of consumer credit. These transactions involved either charges for flight insurance added to the cost of airline tickets purchased with the Koerner Company's American Express card or charges for the renewal of cards that the company asserted were no longer wanted. None of these charges was an extension of consumer credit. Respondent's answers to interrogatories admitted that the airline tickets were purchased for business trips. App. 41a–42a. The renewal charges could be considered charges for an extension of consumer credit only if the overall purposes of the account were consumer purposes. As we already have seen, respondent has provided no evidence indicating that this was so.

Inasmuch as the record establishes that there was no dispute between petitioner and respondent concerning "a statement of [respondent's] account in connection with an ex-

---

3 to its Statement of Uncontested Material Facts, submitted with its Motion for Summary Judgment, Record Item No. 6. These records reveal that respondent used the card approximately 60 times during this period.

[13] See also *American Airlines, Inc.* v. *Remis Industries, Inc.,* 494 F. 2d 196, 201 (CA2 1974); *Credit Card Service Corp.* v. *FTC,* 161 U. S. App. D. C. 424, 428, 495 F. 2d 1004, 1008 (1974).

tension of consumer credit," petitioner was not required to follow the procedures mandated by § 161 (a).

## IV

Because Congress has restricted the operation of § 161 (a) to disputes concerning extensions of consumer credit, and because the dispute between American Express and respondent did not concern an extension of consumer credit, the judgment of the Court of Appeals must be, and is, reversed.

*It is so ordered.*