**Oscar S. GRAY, Appellant**

v.

**AMERICAN EXPRESS COMPANY.**

No. 83–1475.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 12, 1984.

Decided Aug. 31, 1984.

---

Hubert H. Margolies, Washington, D.C., for appellant.

Christopher R. Lipsett, Washington, D.C., with whom John W. Zucker, Washington, D.C., was on brief, for appellee.

Before WILKEY, MIKVA and BORK, Circuit Judges.

Opinion for the Court filed by Circuit Judge MIKVA.

MIKVA, Circuit Judge.

We are called upon to determine what rights, if any, appellant Oscar Gray has against American Express arising from the circumstances under which it cancelled his American Express credit card. The District Court granted summary judgment to American Express; we vacate that judgment and remand for further proceedings.

## I. BACKGROUND

Gray had been a cardholder since 1964. In 1981, following some complicated billings arising out of deferred travel charges incurred by Gray, disputes arose about the amount due American Express. After considerable correspondence, the pertinence and timeliness of which we will detail below, American Express decided to cancel Gray's card. No notification of this cancellation was communicated to Gray until the night of April 8, 1982, when he offered his American Express card to pay for a wedding anniversary dinner he and his wife already had consumed in a Washington restaurant. The restaurant informed Gray that American Express had refused to accept the charges for the meal and had instructed the restaurant to confiscate and destroy his card. Gray spoke to the American Express employee on the telephone at the restaurant who informed him, "Your account is cancelled as of now."

The cancellation prompted Gray to file a lengthy complaint in District Court, stating claims under both diversity and federal question jurisdiction. *See* 28 U.S.C. §§ 1331, 1332; *see also* 15 U.S.C. § 1640. He alleged that the actions of American Express violated the contract between them, known as the "Cardmember Agree-ment," as well as the Fair Credit Billing Act (the "Act"), 15 U.S.C. §§ 1666–1666j, Pub.L. 93–495, Tit. III, 88 Stat. 1511 (1974).* The District Court granted summary judgment for American Express and dismissed the complaint.

The surge in the use of credit cards, the "plastic money" of our society, has been so quick that the law has had difficulty keeping pace. It was not until 1974 that Congress passed the Act, first making a serious effort to regulate the relationship between a credit cardholder and the issuing company. We hold that the District Court was too swift to conclude that the Act offers no protection to Gray and further hold that longstanding principles of contract law afford Gray substantial rights. We thus vacate the District Court's judgment and remand.

## II. DISCUSSION

### A. *The Statutory Claim*

■ Fair Credit Billing Act seeks to prescribe an orderly procedure for identifying and resolving disputes between a cardholder and a card issuer as to the amount due at any given time. The Supreme Court, in *American Express Co. v. Koerner*, 452 U.S. 233, 235–37, 101 S.Ct. 2281, 2283–84, 68 L.Ed.2d 803 (1981), succinctly described the mechanics of the Act as follows:

> If the [cardholder] believes that the statement contains a billing error [as defined in 15 U.S.C. § 1666(b)], he then may send the creditor a written notice setting forth that belief, indicating the amount of the error and the reasons supporting his belief that it is an error. If the creditor receives this notice within 60 days of transmitting the statement of account, [§ 1666(a)] imposes two separate obligations upon the creditor. Within 30 days, it must send a written acknowledgment that it has received the notice. And, within 90 days or two com-

---

* The Act, along with many other provisions of the Truth-in-Lending Act, 15 U.S.C. § 1601 *et seq.*, of which it forms a part, was amended in 1980 by the Truth-in-Lending Simplification and Reform Act, Pub.L. 96–221, Tit. VI, 94 Stat. 168, effective April 1, 1982. The events at issue are governed by, and we cite only to, the pre-amendment version of the Act and its implementing regulations, 12 C.F.R. § 226.14.

plete billing cycles, whichever is shorter, the creditor must investigate the matter and either make appropriate corrections in the [cardholder's] account or send a written explanation of its belief that the original statement sent to the [cardholder] was correct. The creditor must send its explanation before making any attempt to collect the disputed amount. A creditor that fails to comply with [§ 1666(a)] forfeits its right to collect the first $50 of the disputed amount including finance charges. [15 U.S.C. § 1666(e)]. In addition, [§ 1666(d)] provides that, pursuant to regulations of the Federal Reserve Board, a creditor operating an "open end consumer credit plan" may not restrict or close an account due to a [cardholder's] failure to pay a disputed amount until the creditor has sent the written explanation required by [§ 1666(a)] (footnote omitted).

Other obligations also attach. First, if "appropriate corrections" are made, the card issuer also must credit any finance charge on accounts erroneously billed. 15 U.S.C. § 1666(a)(B)(i). Second, the card issuer must notify the cardholder on subsequent statements of account that he need not pay the amount in dispute until the card issuer has complied with § 1666. 15 U.S.C. § 1666(c)(2). Third, the card issuer may not report, or threaten to report, adversely on the cardholder's credit before the card issuer has discharged its obligations under § 1666, 15 U.S.C. § 1666a(a), and, if the cardholder continues to dispute the bill in timely fashion, the card issuer may report the delinquency only if it also reports that the amount is in dispute and tells the cardholder to whom it has released this information. 15 U.S.C. § 1666a(b). The card issuer is further obliged to report any eventual resolution of the delinquency to the same third parties with whom it earlier had communicated. 15 U.S.C. § 1666a(c). Finally, a card issuer that fails to comply with any requirements of the Act is liable to the cardholder for actual damages, twice the amount of any finance charge, and costs of the action and attorney's fees. 15 U.S.C. § 1640(a).

American Express is, of course, a creditor for purposes of the Act. *Koerner, supra,* 452 U.S. at 241 n. 8, 101 S.Ct. at 2286 n. 8.

### 1. *The Billing Error*

The billing dispute in issue arose after Gray used his credit card to purchase airline tickets costing $9312. American Express agreed that Gray could pay for the tickets in 12 equal installments over 12 months. In January and February of 1981, Gray made substantial prepayments of $3500 and $1156 respectively. He so advised American Express by letter of February 8, 1981. There is no dispute about these payments, nor about Gray's handling of them. At this point the numbers become confusing because American Express, apparently in error, converted the deferred payment plan to a current charge on the March bill. American Express thereafter began to show Gray as delinquent, due at least in part to the dispute as to how and why the deferred billing had been converted to a current charge.

The District Court held that Gray failed to trigger the protection of the Act because he neglected to notify American Express in writing within 60 days after he first received an erroneous billing. Gray insists that his first letter to American Express on April 22, 1981, well within the 60 day period set forth in the statute, identified the dispute as it first appeared in the March, 1981 billing. According to Gray's complaint, the dispute continued to simmer for over a year because American Express never fulfilled its investigative and other obligations under the Act.

The District Court made no mention of the April 22, 1981 letter, deeming instead a September, 1981 letter as the first notification from Gray as to the existence of a dispute. We conclude that the District Court erred in overlooking the April letter.

Gray's April 22, 1981 letter complained specifically about the March bill and the miscrediting of the prepayments. Whatever the import and impact of other

correspondence and actions of the parties, we hold that, through this earlier letter, Gray triggered the procedural protections of the Act. The letter enabled the card issuer to identify the name and account number, indicated that the cardholder believed that an error existed in a particular amount and set forth the cardholder's reasons why he believed an error had been made. 15 U.S.C. § 1666(a); *see Lincoln First Bank, N.A. v. Carlson*, 103 Misc.2d 467, 426 N.Y.S.2d 433 (1980) (returned credit slip, with nothing more, could suffice as notice under the Act). The later correspondence and activities may be treated as evidentiary in nature—sufficient perhaps to show that American Express fulfilled all of its obligations under the Act, but not pertinent to the question of whether the Act was triggered in the first place. *See Byers v. Burleson*, 713 F.2d 856, 859 (D.C.Cir. 1983) (appellate court reviewing summary judgment determines whether there is genuine issue of material fact and, if not, whether the law was correctly applied).

### 2. *Reporting and Collection Efforts*

Gray alleged in count III that, notwithstanding his having given notice of dispute under § 1666 through his letters, American Express nevertheless turned over his account for collection to a bill collection agency. The District Judge dismissed this count (misdesignating it as count IV) by concluding that it failed to state a claim for relief. The District Court erred. *See* 15 U.S.C. §§ 1640(a), 1666a. We think that count III states an independent cause of action under § 1666a because Gray's April 22, 1981 correspondence brought the dispute within the Act's coverage. The question of American Express' compliance with the reporting and collection requirements of the Act also warrants consideration on remand.

### 3. *The Act and the Cardmember Agreement*

■ As we have indicated above, the District Court summarily resolved Gray's statutory claims by wrongly concluding that the Act did not apply. On appeal, American Express also urges that, even if the Act is otherwise pertinent, Gray was bound by the terms of the Cardmember Agreement which empowered American Express to cancel the credit card without notice and without cause. The contract between Gray and American Express provides:

> [W]e can revoke your right to use [the card] at any time. We can do this with or without cause and without giving you notice.

American Express concludes from this language that the cancellation was not of the kind prohibited by the Act, even though the Act regulates other aspects of the relationship between the cardholder and the card issuer.

Section 1666(d) of the Act states that, during the pendency of a disputed billing, the card issuer, until it fulfills its other obligations under § 1666(a)(B)(ii), shall not cause the cardholder's account to be restricted or closed because of the failure of the obligor to pay the amount in dispute. *See also* 12 C.F.R. § 226.14(d). American Express seems to argue that, despite that provision, it can exercise its right to cancellation for cause unrelated to the disputed amount, or for *no* cause, thus bringing itself out from under the statute. At the very least, the argument is audacious. American Express would restrict the efficacy of the statute to those situations where the parties had not agreed to a "without cause, without notice" cancellation clause, or to those cases where the cardholder can prove that the sole reason for cancellation was the amount in dispute. We doubt that Congress painted with such a faint brush.

The effect of American Express's argument is to allow the equivalent of a "waiver" of coverage of the Act simply by allowing the parties to contract it away. Congress usually is not so tepid in its approach to consumer problems. *See* 118 Cong.Rec. 14,835 (1972) (remarks by Sen. Proxmire, principal proponent of the Act, concerning a technical amendment to a predecessor bill later carried over into the Act; its purpose

was to prevent "possible evasion" by precluding the creditor from including a predispute waiver provision in the card agreement); 119 Cong.Rec. 25,400 (1973) (remarks by Sen. Proxmire on S. 2101, another predecessor: "The legislation seeks to establish a system for *insuring* that billing disputes or inquiries are resolved in a fair and timely manner.") (emphasis added); *see also Mourning v. Family Publications Service, Inc.*, 411 U.S. 356, 375–77, 93 S.Ct. 1652, 1663–64, 36 L.Ed.2d 318 (1973) (Truth-in-Lending Act should not be narrowly construed); *Koerner v. American Express Co.*, 444 F.Supp. 334, 341 (E.D.La. 1977) (*Koerner* trial court's recitation of Act's legislative history reflecting congressional concern about card issuers' "high-handed tactics" in handling of consumer billing disputes).

Moreover, the consumer-oriented statutes that Congress has enacted in recent years belie the unrestrained reading that American Express gives to the Act in light of its contract. Waiver of statutory rights, particularly by a contract of adhesion, is hardly consistent with the legislature's purpose. The rationale of consumer protection legislation is to even out the inequalities that consumers normally bring to the bargain. To allow such protection to be waived by boiler plate language of the contract puts the legislative process to a foolish and unproductive task. A court ought not impute such nonsense to a Congress intent on correcting abuses in the market place.

Finally, American Express also contends that, even if the Act is not waived totally, its cancellation was proper because it was for reasons other than those prohibited by the statute. A showing of whatever limited grounds for cancellation remain available under § 1666(d) while a dispute is pending calls for substantial evidentiary proceedings, however. If American Express seeks to avail itself of these grounds, a more substantial factual predicate than that established through summary judgment is necessary. *See Harlow v. Fitzgerald*, 457 U.S. 800, 816, 102 S.Ct. 2727, 2737, 73 L.Ed.2d 396 (1982).

Thus we hold that the Act's notice provision was met by Gray's April 22, 1981 letter and remand the case to the District Court for trial of Gray's statutory cause of action. American Express will be obliged to justify its conduct in this case as fully satisfying its obligations under the Act.

### B. *The Contract Claim*

Gray stated a second cause of action in diversity, a contract claim, in which he alleged that American Express violated the Cardmember Agreement by wrongfully cancelling it. Notably, in *Koerner, supra,* the Supreme Court on very similar facts observed that a cardholder could state, in addition to, and separate from, his federal claim under the Act, a claim under state law for cancellation arising out of a credit card billing dispute. 452 U.S. at 239–40 & n. 6, 101 S.Ct. at 2285, & n. 6. *See also Hill v. American Express Co.*, 257 S.C. 86, 184 S.E.2d 115 (1971). Although a state law claim was raised, and addressed, in this case, neither the parties nor the District Court considered the preliminary question of choice of law. The parties failed again to address it on appeal. As a court sitting in diversity, we are obliged, however, to examine that issue.

### 1. *Choice of Law*

Federal courts sitting in the District of Columbia are not obligated to follow the doctrine announced in *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); nevertheless they have looked to the District of Columbia for the applicable choice of law principles (and substantive law of decision) in order to promote uniformity and to assure proper deference to District of Columbia laws. *Anchorage-Hynning & Co. v. Moringiello*, 697 F.2d 356, 360–61 (D.C.Cir. 1983); *Lee v. Flintkote Co.*, 593 F.2d 1275, 1278 n. 14 (D.C.Cir.1979). Of course, federal courts sitting in diversity ordinarily must apply the forum's choice of law principles as well as its substantive law. *Klaxon Co.*

*v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941).

The American Express contract contains a specific provision which states that the agreement will be governed by the law of New York. The District of Columbia courts apparently have not had occasion to consider the efficacy of such a contractual choice of law provision. *Flintkote, supra*, 593 F.2d at 1279 n. 16. When District of Columbia law is silent, it has been the practice of the federal courts in this Circuit to turn to the law of Maryland for historical and geographical reasons. *Conesco Industries, Ltd. v. Conforti & Eisele, Inc.*, 627 F.2d 312, 315–16 (D.C.Cir. 1980). Like most other jurisdictions, Maryland recognizes the ability of parties to agree upon the law which will govern their contract, provided, of course, that the choice bears some substantial relation to the parties or their transaction. *Kronovet v. Lipchin*, 288 Md. 30, 415 A.2d 1096, 1103–06 (1980); *see* Restatement (Second) of Conflict of Laws § 187 (1971). Because American Express is a New York corporation, we find sufficient basis for deferring to the parties' choice of law. We therefore look to the law of New York to interpret this contract.

## 2. *Notice*

We are asked to interpret the "without notice" provision in the Cardmember Agreement. Gray challenges the card issuer's extreme and, in our view, unreasonable interpretation of this language. The District Court concluded that the notice provision was enforceable. We disagree.

It is certainly true that, from the common law immemorial, parties have been free to include whatever conditions and limitations that they may desire in a contract. *See* Restatement (Second) of Contracts, Introductory Note, ch. 8, at p. 2 (1981); *see also id.* § 72 comment b (contract provides opportunity for freedom of action and exercise of judgment). Absent a statutory prohibition or some public policy impediment, *id.* § 178, the very essence of freedom of contract is the right of the

parties to strike good bargains and bad bargains. *See id.* § 79 comment c (exchange of unequal values); *see also Dorman v. Cohen*, 66 A.D.2d 411, 413 N.Y. S.2d 377 (1st Dept.1979) ("mutuality of obligation" does not mean equality). However traditional "cancellation for cause" and "with notice" provisions are to a contract, parties sometimes agree to give them up. *See, e.g., A.S. Rampell, Inc. v. Hyster Co.*, 3 N.Y.2d 369, 165 N.Y.S.2d 475, 144 N.E.2d 371 (1957) (merchant-to-merchant context). Appellant thus would not be the first nor the last cardholder to have surrendered substantial rights. Nor does the fact that Gray paid $35.00 per year for his cardholding privileges automatically entitle him to receive notice or to insist on some showing of cause before his card is cancelled. Indeed, American Express generously provides for a pro-rata refund of the annual charge in the event of cancellation.

The problem, then, is not, as Gray would suggest, the unconscionable nature per se of this clause. Nor is it that this clause contradicts in any actionable way the advertising and puffing that he claims American Express used to entice him into the relationship. (*E.g.*, "When you're out of cash, you're not out of luck."; " ... flexibility to travel and entertain when and where you want, virtually without interruption.") The problem stems from the card issuer's attempt to interpret the "without notice" provision so as to give the creditor's internal cancellation decision effect as against irreversible transactions that already have been completed.

Commonly understood, the function of notice is to provide forewarning of an event. Similarly, in the context of contractual relations, notice allows the party notified to contemplate, and to prepare for, an action that will occur. *See* 1 M. Merrill on Notice §§ 1, 526 (1952). By contrast, and reasonably interpreted, a contract that is cancellable without notice implies that it can be terminated without forewarning. Such a contract provision ordinarily does not suggest, however, that the cancellation

is effective retrospectively to events that transpired prior to notification of the decision to cancel. *Cf. Fifty States Management Corp. v. Public Service Mut. Ins. Co.*, 67 Misc.2d 778, 324 N.Y.S.2d 345 (1971) (after loss occurs, rights of parties become fixed; cancellation may not be effected retroactively) (citing *Duncan v. N.Y. Mut. Ins. Co.*, 138 N.Y. 88, 33 N.E. 730 (1893)); *Marjean, Inc. v. Ammann*, 6 A.D.2d 878, 177 N.Y.S.2d 882 (2d Dept. 1958) ("[N]otice given pursuant to the 'escape clause' in the contract did not terminate liability as to obligations already accrued, but only as to liabilities thereafter accruing."). Indeed, counsel for American Express made this point for us indirectly at oral argument. When he was asked whether, based on his client's interpretation of the "without notice" clause, American Express was empowered to cancel the agreement "retroactively," he answered "yes," but was quick to add that his client would never take such action against a cardholder. We see little, if any, principled distinction, however, between admittedly "retroactive" cancellation and cancellation effective against irreversible obligations incurred after cancellation but before the cardholder learns his card has been cancelled.

The importance of effective notice of contract termination has not escaped the attention of the New York courts and legislature, particularly where an individual could suffer substantial harm if a contract to which he is a party is cancelled without his ever knowing. The most obvious examples come from the field of insurance law where New York, by statute, requires an insurer to give notice of its decision to cancel a policy. *See, e.g.,* N.Y.Ins.Law § 168 (McKinney's 1983) (fire insurance). The obvious, and salutary, purpose behind this policy is not to allow the insured to contest the decision, but to enable him to take steps to avoid a lapse in protection—a risk not wholly unlike that which a cardholder who intends to use his card to pay for a completed and irreversible transaction expects to avoid.

 The parallel between New York insurance law and credit card law carries into contract interpretation, too. The New York case law instructs us to interpret credit card agreements by using the "rules for construction of insurance contracts." *Uni-Serv Corp. v. Frede*, 50 Misc.2d 823, 271 N.Y.S.2d 478, 483 (1966), *aff'd*, 53 Misc.2d 644, 279 N.Y.S.2d 510 (1967). Like the insurance contract, the Cardmember Agreement was not negotiated, but was prepared exclusively by the card issuer; consequently, it should be construed narrowly against the creditor. *Id.; see Miller v. Continental Ins. Co.*, 40 N.Y.2d 675, 389 N.Y.S.2d 565, 358 N.E.2d 258 (1976); Restatement (Second) of Contracts § 206 (in choosing among interpretations, meaning which operates against drafters is preferred). This rule blends two independent canons of construction: first, that a contract is interpreted against its drafter and second, that a contract of adhesion should be strictly construed. *See Surrey Strathmore Corp. v. Dollar Savings Bank*, 36 N.Y.2d 173, 179, 366 N.Y.S.2d 107, 112, 325 N.E.2d 527, 531 (1975) (Wachtler, J., dissenting) (canons distinguished); *see also Miner v. Walden*, 101 Misc.2d 814, 422 N.Y.S.2d 335, 337 (1979) ("adhesion contract" is a "standardized contract form" offered without realistic opportunity to bargain and in which consumer must acquiesce to obtain desired product or service).

 These authorities confirm our conclusion, as a court sitting in diversity, that the interpretation American Express proffers would not find favor in the New York courts. There can be no dispute that American Express drew the language for a broad application. But if American Express were correct in its interpretation, it even could refuse to honor past charges long since incurred—an outcome that must be rejected even in application of *strictum jus.* The right to cancel "without giving you notice" means that the decision to cancel can be entirely unilateral and instantaneous. It cannot, however, be an internalized decision which is never communicated to the cardholder. Such a reading defies

any reasonable expectation that the parties could have had about their contractual relationship. *See Uni-Serv, supra,* 271 N.Y. S.2d at 483 ("It is not to be assumed that people act unreasonably to their own disadvantage, and an interpretation which assumes that they so acted is not favored.") (quoting *Brown v. McGraw-Hill Book Co., Inc.,* 25 A.D.2d 317, 269 N.Y.S.2d 35, 38 (1st Dept.1966), *aff'd,* 20 N.Y.S.2d 826, 285 N.Y.S.2d 72, 231 N.E.2d 768 (1967)); *see also* 1 Williston on Contracts § 105 at 418 (3d ed. 1957) (interpret contract so as not to favor arbitrary cancellation clause); *cf. Tymshare, Inc. v. Covell,* 727 F.2d 1145, 1154 (D.C.Cir.1984) (applying Virginia law; "[I]t is simply not likely that the parties had in mind a power quite as absolute as appellant suggests .... [A]greeing to such a provision [retroactive compensation reduction] would require a degree of folly ... we are not inclined to posit where another plausible interpretation of the language is available."). Thus, we think that the "without notice" provision is given full weight by allowing the cancellation to be unilateral and to be given contemporaneous effect upon communication. To say that "without notice" also means that it never need be communicated to the cardholder extends the clause, and the waiver it contains, "to circumstances not covered." 2 M. Merrill, *supra,* § 899 at p. 427 (waiver of notice construed narrowly).

Indeed, the interpretation of the language urged by American Express would subsume the entire contract and make the underlying contractual relationship illusory. *See Niagara Mohawk Power Corp. v. Graver Tank & Mfg. Co.,* 470 F.Supp. 1308, 1316 (N.D.N.Y.1979) (applying New York law; presence of notice requirement in otherwise broad termination provision prevents promise from being illusory); Restatement (Second) of Contracts § 77 comment a (illusory promises); 1A Corbin on Contracts § 163 at p. 76 (1963) ("If a promisor reserves the power to cancel at any time without notice, his promise seems to be unenforceable, ...."); 1 Williston, *supra,* § 105 at p. 418 ("An agreement wherein one party reserves the right to cancel at his pleasure cannot create a contract.") (footnote omitted). We therefore hold that, even as a contract of adhesion, the language quoted above has limitations. The card can be revoked without cause and without any waiting period, but it cannot be revoked for transactions that already have occurred.

American Express suggests that if the clauses are not upheld in the manner it urges, there will be a great risk thrown on the credit card business. We think they protest too much. Within the limits of state and federal statutes, credit cards can still be cancelled without cause and without notice. But the cancellation can affect only transactions which have not occurred before the cancellation is communicated to the cardholder. In practical terms American Express will have to make an effort to communicate its cancellation decision to the cardholder. The effort may be as informal as a phone call or a telegram. We leave to future cases the question of what constitutes a good faith effort to communicate the cancellation decision to the cardholder.

█ Nor need we decide what fact situations would allow the communication of the cancellation to take place through the merchant involved in the transaction. If a cardholder seeks to use his American Express card to buy a car, for example, we think that a communication, through the car dealer, that the card has been cancelled prior to title passing to the cardholder may effect notice in reasonable fashion. But where the meal has been consumed, or the hotel room has been slept in, or the service rendered, the communication through the merchant comes too late to void the credit for that transaction.

Even contracts of adhesion are contracts. To allow cancellation without any communication of the decision is to turn the contract into a snare and deceit. It may well be that an *offeree* has less expectation of performance and that the terms and conditions of withdrawal of the offer can be, as American Express argues, much more absolute and *ex parte. See* Restatement (Second) of

Contracts § 42 comment a. But contracts, as opposed to offers, are made of sterner doctrine; to interpret this contract so as to sanction the conduct of American Express in this case would empty the agreement of all meaning.

It is in this respect that we distinguish the authorities cited by appellee which, coming from jurisdictions other than New York, may not be relevant here. Although the parties were not able to agree as to the function of the $35.00 annual fee that Gray paid for the privilege of being an American Express cardholder, they did agree, in their briefs and at oral argument (as did the District Court in its memorandum opinion), that the Cardmember Agreement is a contract. *See Sternberg v. Citicorp Credit Services, Inc.*, 69 A.D.2d 352, 419 N.Y.S.2d 142 (2d Dept.1979), *aff'd*, 50 N.Y.2d 856, 430 N.Y.S.2d 54, 407 N.E.2d 1350 (1980); *Chase Manhattan Bank, N.A. v. Hobbs*, 94 Misc.2d 780, 405 N.Y.S.2d 967 (1978); *Empire National Bank v. Monahan*, 82 Misc.2d 808, 370 N.Y.S.2d 840 (1975); *UniServ, supra*, 271 N.Y.S.2d at 480–82. For this reason, appellee's cases are inapposite. We note first that *none* of the cases cited by American Express involved situations in which cardmember annual fees were charged. Second, and more importantly, appellee's cases did not treat the parties' relationship as one governed by contract. Instead, the opinions ranged from flatly rejecting the notion that any contractual relationship was formed by the agreement, *Novack v. Cities Service Oil Co.*, 149 N.J. Super. 542, 374 A.2d 89 (1977), *aff'd*, 159 N.J.Super. 400, 388 A.2d 264 (1978); to (apparently) treating each transaction as a separate offer and acceptance, *City Stores Co. v. Henderson*, 116 Ga.App. 114, 156 S.E.2d 818 (1967); to outright ambivalence. *Garber v. Harris Trust & Savings Bank*, 104 Ill.App.3d 675, 60 Ill.Dec. 410, 432 N.E.2d 1309 (1982). (Notably, the *Garber* court, weighing the effectiveness of attempted modifications to the cardholder agreement by various card issuers, observed that the modifications were applicable to *future* transactions only and that the cardholders had received notice of the changes before they took effect. *Id.* 60 Ill.Dec. at 411–12, 432 N.E.2d at 1310–11.) We also conclude that appellee's reliance on *Wood v. Holiday Inns, Inc.*, 508 F.2d 167 (5th Cir.1975), is equally misplaced. The court there focused primarily on questions of agency and of negligence and, in the process, assumed that the cancellation clause was enforceable. We decline to be bound by an opinion which seemingly approved such a broad termination clause without any discussion or analysis of its validity.

We therefore hold that the cancellation without notice provision, as interpreted by American Express, is unenforceable. We remand the case to the District Court to resolve Gray's claims under the contract.

### C. *Discovery*

Because the case is to be remanded for further proceedings, we think it appropriate to comment on the appellee's extraordinary use of interrogatories below. It appears to be of some significance to this case that Gray is a lawyer, because only a lawyer, tenacious even beyond the professional custom, would have been able to withstand the expenses and excesses of this litigation. Perhaps the presence of a lawyer-plaintiff caused American Express particular concern that occasioned their plethora of interrogatories; perhaps it was the shorter, but nonetheless substantial, set of interrogatories that plaintiff served on defendant. Whoever was the instigator and whatever the reason, the various sets of interrogatories and their answers are in the hundreds of pages. They run as far afield as inquiring the name of every law firm that plaintiff had been affiliated with since 1951 to asking all of the "professional credentials" that he had acquired in his lifetime; from psychiatrists consulted since 1978 to meals eaten at the fated restaurant since the suit was filed. The length, scope and detail of the interrogatories propounded by American Express suggest a strategy of attrition rather than a legitimate discovery of the facts needed to resolve a dispute over the account.

We cannot expect the District Judge to police the quantity or equality of interrogatories when discovery is abused in the way it appears to have been in this case. Gray did object to some of the interrogatories, as did American Express. But when the parties do not raise the question of *general* abuse of discovery, it is difficult for a trial judge, viewing the process segmentally, to realize how burdensome it has become. On remand, we think the trial court should take the quantity and relevance of the discovery into account in setting the case for trial and in determining what, if any, further discovery should be allowed, and in deciding whether sanctions for abusive litigation practices are appropriate. *See Roadway Express, Inc. v. Piper*, 447 U.S. 752, 764–67, 100 S.Ct. 2455, 2463–64, 65 L.Ed.2d 488 (1980) (inherent power to impose sanctions); Fed.R.Civ.P. 26(b), (g) and Notes of Advisory Committee, 1983 Amendment (amended rule "contemplates greater judicial involvement in the discovery process").

The size of the record and the vigor with which the defenses have been pursued make it apparent that only a stubborn professional could seek to avail himself of the protection guaranteed by statute and the common law. The courts must exercise control so that access to justice is not foreclosed by such tactics at the preliminary stages of suit. Deep pockets and stubbornness ought not be prerequisites to bringing a case like this one to issue.

### III. Conclusion

The District Court's order of summary judgment and dismissal is hereby vacated. The case is remanded for further proceedings consistent with this opinion.

*So Ordered.*