Peter BELMONT, Plaintiff,

v.

**ASSOCIATES NATIONAL BANK
(DELAWARE), Defendant.**

No. Civ.A. 99–CV–3445.

United States District Court,
E.D. New York.

Aug. 18, 2000.

**152**

Mr. Peter Belmont, Brooklyn, NY, Plaintiff, pro se.

Kenneth L. Gellhaus, McNamee, Lochner, Titus & Williams, P.C., Albany, NY, for Defendant.

### MEMORANDUM AND ORDER

TRAGER, District Judge.

Plaintiff Peter Belmont, an attorney licensed to practice in the State of New York, but acting pro se in this matter, brought this suit against Associates National Bank (Delaware) ("Associates") under the Truth in Lending Act ("TILA" or the "Act"), 15 U.S.C. § 1601 *et seq.*, and Regulation Z thereunder, 12 C.F.R. § 226.13, for failure to properly respond to a notice of billing error and for having threatened to make adverse credit reports while the billing error remained unresolved.

Peter Belmont alleges that on a monthly statement dated May 5, 1998, he was improperly billed for charges made on his son's Associates MasterCard credit card account. While Associates maintained that Peter Belmont was a co-obligor on his son's account and was thus liable for charges on the account after his son filed for bankruptcy, Peter Belmont questioned

whether he was an obligor and demanded documentary proof of his obligation. Peter Belmont claims that Associates failed to comply with the requirements of TILA in responding to his notice.

Associates has moved for dismissal of, or in the alternative, for summary judgment on, all claims brought by Peter Belmont. Peter Belmont filed a cross-motion for summary judgment in response.

## Background

Associates alleges that its records indicate that on September 21, 1987, Peter Belmont and his son, Jeremy Belmont, opened a Boatmen's Bank of St. Louis ("Boatmen's") MasterCard credit card account which was later purchased by Associates. *See* Def.'s Notice of Mot., Affidavit of Kenneth L. Gellhaus dated January 6, 2000 [hereinafter Gellhaus Aff.], Ex. G.[1] Peter Belmont acknowledges that in September 1987 he did co-sign for a credit card account with his son, but does not recall doing so with either Boatmen's or Associates and states that he no longer has a copy of the credit card application. *See* Pl.'s Notice of Cross–Mot. at 7; Pl.'s Decl.

Opp'n Def.'s Mot. Dismiss at 8 [hereinafter Pl.'s Decl. Opp'n].

On April 6, 1992, Peter Belmont sent a letter entitled "NOTICE OF REVOCATION OF CO_SIGNER_SHIP" to Consumer Loan Center, P.O. Box 9101, Boston, MA 02209–9101, regarding a MasterCard account numbered 5417–6710–0001–9848, in which he stated that he wished to be removed as a co-signer on his son's account.[2] *See* Gellhaus Aff., Ex. J. In the letter, Peter Belmont noted that the account was "in arrears in the amount of $48.00 and going into a 30–day late status." *Id.* He further stated: "I no longer wish to guarantee borrowing against this account or to have my credit-worthiness affected by the failure of the account's holder, Mr. Jeremy Belmont, to pay his bills in timely fashion." *Id.* With the letter, Peter Belmont sent a check, dated April 5, 1992, for $48.00 to "The Massachusetts Co." with "Jeremy Belmont 5417 6710 0001 9848 M/C" specified on the check's memo line. *See id.* On the canceled check, cashed at the Texas Commerce Bank–Dallas on April 11, 1992, the account number was

1. Nowhere in either party's papers is the original Boatmen's account number specified. From January 1993 to September 1995, the Associates billing statements indicated that the account number was 5419–3127–0000–2648. *See* Affidavit of Todd Mitchell, Vice President, Associates [hereinafter Mitchell Aff.], Ex. A (copies of Associates's billing statements addressed to Jeremy Belmont, primary obligor, and to Peter Belmont, co-obligor, from January 5, 1993 to April 5, 1998). Although the January to March 1993 billing statements displayed "5419–3127–0000–2648" in the box labeled "Account Number," the "Date and Description of Transaction" section of the statement stated, "THE ACCOUNT NUMBER ON YOUR CURRENT CARD IS 5417671000019848." *Id.* Then, beginning with the billing statement of October 5, 1995, addressed to Jeremy Belmont and Peter Belmont but mailed only to Jeremy Belmont's address in Massachusetts, the account number was listed as 5419–3104–3000–1104. *See id.* Finally, the Associates billing statement of December 5, 1997 noted that the account number had been changed to 5457–1500–5024–6016, the balance had been trans-

ferred, and a new credit card was on its way. *See id.* The account retained this last number on the statements sent to plaintiff that form the subject of this action.

2. Peter Belmont does not expressly claim that this letter relates to a Boatmen's or Associates account, only that it may have. However, in a July 29, 1998 letter to Associates asserting that he was not liable for Jeremy Belmont's charges, Peter Belmont described the April 26, 1992 correspondence in the following terms:

[H]aving paid off an overdue amount, I directed a credit card company (apparently not ASSOCIATES) to remove my name as a co-signer on an account of my son, Jeremy Belmont. I heard no more about any account on which I had co-signed until your communications in 1998, seeking (apparently) to revive that long-quiescent co-signership relationship. I believe that by my letter of April 6, 1992, I ended my responsibility for Jeremy Belmont's credit card debts.

Gellhaus Aff., Ex. I, at 2.

crossed-off on the memo line and replaced by the account number "5419312700002648," *see* Gellhaus Aff., Ex. J, the Associates account number held by Jeremy Belmont from January 1993 until October 1995, *see supra* note 1.

Associates denies ever having received Peter Belmont's April 1992 letter and avers that the Consumer Loan Center address specified in the letter was never an address used by Associates. *See* Mitchell Aff. ¶¶ 9–10. Associates, however, offers no explanation of how its account number came to be placed on the check Peter Belmont enclosed with the letter.

At any rate, the Associates statements on the account sent to Jeremy Belmont at his addresses in Massachusetts and California from January 1993 through April 1998 continued to list Peter Belmont as an addressee.[3] The elder Belmont, however, has resided at 166 Columbia Heights, Brooklyn, N.Y. 11201–2105 since September 1992. *See* Reply Decl. Supp. Pl.'s Cross–Mot. ¶ 3.

The monthly statement for the billing period ending January 5, 1998, indicates that Jeremy Belmont made his last payment on the account on December 29, 1997. *See* Mitchell Aff., Ex. A. The February, March, and April statements show that no payments were made in, and finance and late charges were assessed for, those months. *See id.* The March and April statements also advised that the account had been suspended and was in danger of closure if no payment was made. *See id.*

Then, on April 28, 1998, Associates removed Jeremy Belmont from the account when he filed for bankruptcy. *See* Pl.'s Notice of Cross Mot., Ex. 3. Associates claims that his son's default made Peter Belmont the primary cardholder on the account and thus, solely responsible for payment of the debt. *See id.* As a result, Associates sent the next monthly statement, dated May 5, 1998, to "Peter A Belmont, 166 Columbia Heights, Brooklyn, N.Y. 11201–2105." *See id.*, Ex. 1. This statement showed that the account had been assessed finance charges and a late charge that brought the balance owed to $1,895.49 and stated that a minimum payment of $413.49 was due on May 30, 1998. *See* Pl.'s Decl. Opp'n, Ex. 1. .

On May 15, 1998, Peter Belmont sent Associates a six-page letter (dated May 13, 1998) by certified mail, return receipt requested, with the caption "NOTICE OF BELIEVED BILLING ERROR AND REQUEST FOR DOCUMENTARY EVIDENCE OF CONSUMER INDEBTEDNESS." *See* Gellhaus Aff., Ex. E [hereinafter Notice of Billing Error]. Associates received the letter on May 19, 1998. *See* Pl.'s Decl. Opp'n, Ex. 2 (return receipt card). In the letter, Peter Belmont stated that he did not admit to being an obligor on the account and believed the bill for $1,898.49 was in error because he had no contractual obligation to pay any amount borrowed under the account.[4] *See id.* at 2.

---

**3.** From January 5, 1993 until August 5, 1993, statements were mailed to Jeremy Belmont and Peter Belmont at 62A Squire Village, Sunderland, MA 01375–9462; from September 5, 1993 until March 4, 1995 statements were mailed to 371 Plainfield Rd., Concord, MA 01742–5730; and from April 6, 1995 to April 5, 1998, statements were mailed to Monterey Park, CA. *See* Mitchell Aff., Ex. A.

**4.** Throughout all of his exchanges with Associates, Peter Belmont never admitted to being an obligor because he lacked documentary evidence to show his status, but allowed that he might have been obligated, *see, e.g.,* Gellhaus Aff., Ex. E at 2, ¶ 5(b) ("If I should prove

to be obligated in some degree ...."), and some of his initial filings on this motion make similar statements, *see, e.g.,* Pl.'s Decl. Opp'n Def.'s Mot. Dismiss at 8, ¶ 12; Pl's Decl. Supp. Cross–Mot. at 1, ¶ 3. However, after discovery commenced it became clear that Peter Belmont's 1992 cancellation letter corresponded to the same account later held by Associates, and Peter Belmont changed his language to reflect that knowledge—essentially admitting that he was obligated on the account at one time, but still asserting that he was released from obligation as a result of the 1992 letter.

Specifically, Peter Belmont wrote: "The listing on this BILL of my name and address is, I believe, a computational or similar billing error of an accounting nature." *Id.* Further, Peter Belmont stated that if he were proven to be obligated in some way, he would continue to challenge the amount due as a billing error, because he had never had prior correspondence from Associates, such as billing statements or other documents detailing the charges. *See id.* at 2–3. Finally, Peter Belmont demanded that Associates provide him with documentary evidence, including contracts, agreements and applications executed by him for the account, as well as copies of any written communications sent to him by Associates or any other lender pertaining to the account. *See id.* at 4.

On June 23, 1998, Peter Belmont sent by certified mail, return receipt requested, a second letter to Associates, *see* Pl.'s Decl. Opp'n, Ex. 2, that was "substantially identical" to his May 13, 1998 letter, Am. Compl. ¶ 8. Associates received this second letter on June 30, 1998. *See* Pl.'s Decl. Opp'n, Ex. 2 (return receipt card).

On June 25, 1998—thirty-seven days after Peter Belmont's first letter was received—Associates sent Peter Belmont a letter (signed by "Ebe, J"), "Re: Associates National Bank (Delaware), Account No.: 5457150050246016, Amount Due: $266.00," Pl.'s Decl. Opp'n Def.'s Mot. Dismiss, Ex. 3, which stated:

> We have made several attempts to reach you [apparently not in writing] but have been unsuccessful. Our goal is to work out a solution for your delinquent balance and help bring your account to a current status.... Do not allow this situation to become more serious. Protecting your credit is important to you both today and in the future.

*Id.* Enclosed with the letter was another billing statement showing that the account balance was now $1,959.88, with a total amount due of $266.00. *See id.*

On July 20, 1998—sixty-two days after Peter Belmont's first letter was received

and twenty days after his second letter was received—Associates sent Peter Belmont a letter, "Re: THE ASSOCIATES MASTERCARD, Account Number: 5457 1500 5024 6016," in which Patrick Wilson ("Wilson") of Associates's Customer Relations department wrote: "We have received your recent correspondence regarding the above-referenced account. We have ordered additional information in order to respond to your correspondence properly." Gellhaus Aff., Ex. F.

Associates sent Peter Belmont a second letter signed by Wilson, also dated July 20, 1998, stating that the account had been opened on September 21, 1987 in the names of Peter Belmont and Jeremy Belmont, and adding that plaintiff became the primary cardholder on the account when Jeremy Belmont filed for bankruptcy. *See* Gellhaus Aff., Ex. G. The letter stated that Associates was unable to find a copy of the original application and further advised Peter Belmont that if he wanted a copy of the original application, he would have to contact Boatmen's. *See id.*

On July 22, 1999, Associates sent Peter Belmont another letter (signed by "V. Maxey") which was identical to its June 25th letter, except that the amount due was specified as $316.00 and the account balance had risen to $2,024.29. *See* Pl.'s Decl. Opp'n, Ex. 3. This letter also included the same warning regarding Peter Belmont's credit. *See id.*

On July 29, 1998, Peter Belmont sent Associates a third letter bearing the caption "NOTICE OF BELIEVED BILLING ERROR AND REQUEST FOR DOCUMENTARY EVIDENCE OF CONSUMER INDEBTEDNESS." *See* Gellhaus Aff., Ex. I. In the letter, Peter Belmont wrote that he believed the entire balance on the account—$1,959.88 (which included the $1,895.49 he had previously contested, as well as $29.00 in additional late charges and $35.39 in finance charges which were newly billed on the statement for the period ending June 5, 1998)—was

erroneously billed. *See id.* Peter Belmont referenced his previous letters to Associates and stated that the July 20, 1998 letter signed by Patrick Wilson "failed to satisfy [his] demand for documentation in any respect." *Id.* Finally, Peter Belmont stated that he believed that his April 6, 1992 letter to Consumer Loan Center absolved him of responsibility for Jeremy Belmont's credit card debts. *See id.*

On August 5, 1998, Associates sent Peter Belmont another monthly billing statement for the MasterCard account. *See* Pl.'s Notice of Cross–Mot., Ex. 1. The statement showed that no payment had been made, but a finance charge of $37.79 and a late charge of $18.00 had been assessed, raising the balance to $2,080.08, with a minimum payment of $748.08 due on August 30, 1998. *See id.* Finally, this statement advised: "Your account is seriously past due. Send in the total amount due immediately." *Id.*

On August 10, 1998, Associates sent Peter Belmont another letter signed by Wilson, which reiterated information from the second July 20th letter, and again asserted that Peter Belmont was the sole obligor on the account because of his son's bankruptcy filing. *See* Gellhaus Aff., Ex. H. The letter also responded to Peter Belmont's belief that his 1992 request to be removed as a joint cardholder applied to the Associates account by stating:

> [O]ur records do not indicate that your name was ever removed as a primary cardholder on this account. Please forward supporting documentation from Boatmen's ... confirming that your name was removed from this account ... and we will adjust our records accordingly. Unfortunately, we are not legally obligated to provide you a copy of your original application. In order to obtain a copy of your original applica-

tion, you will need to contact Boatmen's ....

*Id.*

On August 13, 1998, a consumer credit report for Peter Belmont, issued by Trans Union, a credit reporting firm, included an Associates credit card account 5457–1500–5024–6016 opened in September of 1987 in Peter Belmont's name, closed in February of 1998, and updated in June of 1998.[5] *See* Pl.'s Decl. Opp'n, Ex. 4. The Trans Union report also contained the following adverse credit information: (1) $218 was past due; (2) the account was 120 days past due when it was closed in February 1998; and (3) in the twelve months before closing, the account had been up to 120 days late. *See id.*

On June 18, 1999, Peter Belmont filed his original complaint in this action, seeking relief under 15 U.S.C. §§ 1640(a)(2)(A), 1640(a)(3) and 1666(e). On that same day, Associates sent Peter Belmont a letter, signed by Todd Mitchell, an Associates vice president, which advised that Associates had deleted the "tradeline from all credit reporting agencies. Nothing is due." Gellhaus Aff., Ex. C.

On July 16, 1999, Peter Belmont filed an amended complaint which was substantially similar to the original except that it added a request for attorney's fees. Defendant served their answer on September 27, 1999. *See* Gellhaus Aff., Ex. B. Initial discovery proceeded in accord with Fed. R.Civ.P. 26, and on January 6, 2000, Associates moved to dismiss or, in the alternative, for summary judgment in its favor. On February 28, 2000, Peter Belmont filed a cross-motion for summary judgment.

**Discussion**

Because defendant relies on matters outside the pleadings, its motion will be treated as one for summary judgment. *See* Fed.R.Civ.P. 12(b). Plaintiff has responded with evidence made relevant by a

---

5. Neither party has provided information regarding the nature of the February 1998 clos-

ing or the June 1998 update.

motion for summary judgment, and both parties have filed statements and counter-statements pursuant to Eastern District Local Rule of Civil Procedure 56.1.

Summary judgment shall be granted when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). On a motion for summary judgment, the court must consider "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). In making this determination, all factual inferences must be drawn in favor of the party against whom summary judgment is sought, viewing the factual assertions in materials such as affidavits, exhibits, and depositions in the light most favorable to the party opposing the motion. *See, id.* at 255, 106 S.Ct. at 2513; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). However, "conclusory statements, conjecture, or speculation" by the non-moving party will not defeat the Summary judgment shall be granted when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). On a motion for summary judgment, the court must consider "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). In making this determination, all factual inferences must be drawn in favor of the party against whom summary judgment is sought, viewing the factual assertions in materials such as affidavits, exhibits, and depositions in the light most favorable to the party opposing the motion. *See, id.* at 255, 106 S.Ct. at 2513; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). However, "conclusory statements, conjecture, or speculation" by the non-moving party will not defeat the motion. *Kulak v. City of New York*, 88 F.3d 63, 71 (2d Cir.1996).

### (1)

Peter Belmont brought this action under 15 U.S.C. § 1640, alleging that Associates failed to comply with the billing-error correction provisions of TILA, 15 U.S.C. §§ 1666–1666a. *See* Am. Compl. ¶¶ 3–4, 17–19. Peter Belmont claims that defendant made a billing error when it sent him the May 5, 1998 billing statement for the MasterCard account numbered 5457–1500–5024–6016 because he had never borrowed on the account, and because he believed that his 1992 letter released him of responsibility for his son's debts. Peter Belmont further claims that Associates's response to his May 13, 1998 Notice of Billing Error did not comply with the provisions of TILA.

■ Section 1666 provides that if an obligor responds, within sixty days, to a creditor's statement of account pertaining to a consumer line of credit by properly notifying the creditor that he or she believes a billing error has occurred, the creditor must comply with the provisions of the Act. *See* 15 U.S.C. § 1666. A written notice of a billing error complies with the requirements of § 1666 when it:

> (1) sets forth or otherwise enables the creditor to identify the name and account number (if any) of the obligor, (2) indicates the obligor's belief that the statement contains a billing error and the amount of such billing error, and (3) sets forth the reasons for the obligor's belief (to the extent applicable) that the statement contains a billing error....

*Id.* § 1666(a).

Associates argues that Peter Belmont's letter of May 13, 1998 is not a billing error notice within the meaning of § 1666—and hence did not trigger Associates's statutory obligation to respond—for two reasons.

*See* Def.'s Am. Statement Pursuant to Local Rule 56.1(b) ¶¶ 3–4. First, defendant contends that the "Wrong–Person Error" alleged by Peter Belmont does not constitute a "billing error" under § 1666(b). *See* Def.'s Reply Mem. Opp'n Pl.'s Cross–Mot. Partial Summ. J. at 2–3. Second, defendant argues that even if the error alleged by Peter Belmont does constitute a billing error, his Notice of Billing Error did not conform to the requirements of § 1666(a). *See id.* at 1; Def.'s Reply Mem. Summ. J. at 3. Each of defendant's arguments is considered in turn below.

### a. Billing Error

Section 1666(b) defines a "billing error" to be any of the following:

(1) A reflection on a statement of an extension of credit which was not made to the obligor or, if made, was not in the amount reflected on such statement.

(2) A reflection on a statement of an extension of credit for which the obligor requests additional clarification including documentary evidence thereof.

(3) A reflection on a statement of goods or services not accepted by the obligor or his designee or not delivered to the obligor or his designee in accordance with the agreement made at the time of a transaction.

(4) The creditor's failure to reflect properly on a statement a payment made by the obligor or a credit issued to the obligor.

(5) A computation error or similar error of an accounting nature of the creditor on a statement.

(6) Failure to transmit the statement required under section 127(b) of this Act [15 U.S.C. § 1637(b) ] to the last address of the obligor which has been disclosed to the creditor, unless that address was furnished less than twenty days before the end of the billing cycle for which the statement is required.

(7) Any other error described in regulations of the [Federal Reserve] Board. 15 U.S.C. § 1666(b).

Peter Belmont contends that a creditor's demand for payment on an account from someone who is (allegedly) not an obligor on the account, which he describes as a "Wrong–Person Error," qualifies as a billing error under paragraphs (1), (2), and (5) of § 1666(b). *See* Pl.'s Mem. Opp'n at 9–15. In response, Associates argues that § 1666 "by the plain meaning of its language, simply does not cover alleged errors of personal identification." Def.'s Reply Mem. Supp. Summ. J. at 2. Associates characterizes § 1666 as "a transaction dispute statute. It is not a statute that applies to questions of who is obligated to pay correct billing charges to the account." *Id.* at 2–3.

Associates cites only a single case, *Doyle v. Household Credit Servs.,* 844 F.Supp. 13 (D.Me.1994), in support of its interpretation what constitutes a "billing error." *See* Def.'s Reply Mem. Supp. Summ. J. at 2. In *Doyle,* the defendant credit card issuer, sent erroneous reports to credit reporting agencies, which stated that the plaintiff had filed for bankruptcy. *See Doyle,* 844 F.Supp. at 15. As a result of these erroneous bankruptcy reports, plaintiff had a mortgage application denied. The plaintiff contacted the defendant to notify it of the believed error, *and* within two months, the defendant had corrected the information and notified the credit reporting agencies that they should delete the bankruptcy report. Nonetheless, the plaintiff brought suit under 15 U.S.C. §§ 1640 and 1666a(c). Ultimately, the *Doyle* court held that the defendant was not liable because "billing error[s]" as defined in § 1666(b) do not encompass the information transmitted to the credit reporting agencies by the defendant. *See id.*

*Doyle,* however, is easily distinguished from the instant case. The "billing error" alleged in *Doyle* was contained in a statement from a creditor issued to third parties, viz., the credit reporting agencies,

rather than in a "statement of an extension of credit" provided to the obligor. 15 U.S.C. § 1666(b). Thus, the error in *Doyle* indeed did not fall within the plain language of the statute, since notices sent to third parties are not errors in a "statement reflecting an extension of credit," and hence not "billing errors." *Id.* *Doyle*, therefore, lends no support to Associates's argument, considering that this is a case where a statement, allegedly in error, was mailed to plaintiff by defendant, demanding payment.

 Instead, this case presents an issue which appears to be one of first impression in the federal courts, namely whether the "Wrong–Person Error" alleged by plaintiff is encompassed by § 1666(b). It is necessary, therefore, to look first to the language of the statute. In doing so, it must be remembered that TILA is a remedial act intended to protect consumers, *see* 15 U.S.C. § 1601(a) ("It is the purpose of this subchapter ... to protect the consumer against inaccurate and unfair credit billing and credit card practices."), and, as such, its provisions are to be construed liberally in favor of consumers. *See Ellis v. General Motors Acceptance Corp.*, 160 F.3d 703, 707 (11th Cir. 1998) (holding TILA is remedial legislation which should be "construed liberally in order to best serve Congress' intent"); *Begala v. PNC Bank, Ohio, Nat'l Ass'n*, 163 F.3d 948, 950 (6th Cir.1998), *cert. denied*, —— U.S. ——, 120 S.Ct. 166, 145 L.Ed.2d 141 (1999) ("TILA is a remedial statute and, therefore, should be given a broad liberal construction in favor of the consumer."); *N. C. Freed Co. v. Board of Governors of Fed. Reserve Sys.*, 473 F.2d 1210, 1214 (2d Cir.1973) (holding that because the statute is remedial in nature, its

terms must be construed in liberal fashion if the underlying Congressional purpose is to be effectuated).

In this light, the "Wrong–Person Error" alleged by plaintiff can be deemed to fall under paragraphs (1) and (2) of § 1666(b). Under paragraph (1) of § 1666(b), a billing error includes "a statement of credit which was not made to the obligor or, if made, was not the amount reflected on such statement." 15 U.S.C. § 1666(b)(1). Under TILA, "credit" simply refers to a right that a creditor grants a debtor to defer payments of debt, whereas an "extension of credit" occurs when an individual opens or renews an account that lets him do so. *See American Express Co. v. Koerner*, 452 U.S. 233, 241, 101 S.Ct. 2281, 2286, 68 L.Ed.2d 803 (1981). Here, although it appears that Peter Belmont opened a credit account and gained an "extension of credit" in 1987, he contended in his May 13, 1998 letter to Associates that he was not an obligor on the Associates account and, thus, implied that Associates never extended credit to him in the amount stated on the May 5, 1998 billing statement, viz., the entire amount of the statement, $1,898.49.[6] Nothing in paragraph (1) indicates that its scope is limited to particular charges to the account, as opposed to the entire account itself. Thus, plaintiff's "Wrong–Person Error" falls within the language of paragraph (1), liberally construed.

For similar reasons, plaintiff's "Wrong–Person Error" also qualifies as a billing error under § 1666(b)(2). Peter Belmont's May 13, 1998 letter clearly requested clarification, including documentary evidence, regarding whether Associates had, in fact, extended him the credit reflected on the May 5, 1998 statement, viz., the entire balance of $1,898.49.

---

6. Although it remains an open issue whether plaintiff was in fact an obligor on the account after his 1992 letter, the disposition of that question has no bearing on the legal issue of whether a notice that alleges that the plaintiff is not an obligor qualifies as a notice of "billing error" under § 1666(b). Section 1666's requirements that a creditor promptly respond to consumer inquiries is triggered upon receipt of a timely notice of "billing error" regardless of whether the consumer who sent the notice was correct in his belief that an error had been made. Simply put, the fact that a TILA plaintiff was incorrect in his belief that a billing error had occurred is not a defense to an action under § 1640.

Whether, as argued by plaintiff, the "Wrong–Person Error" could also qualify as a "computation error or similar error of an accounting nature" under § 1666(b)(5) presents a more difficult question of interpretation, which need not, and will not, be addressed given that the error alleged by Belmont clearly falls within the language of paragraphs (1) and (2), liberally construed.

### b. Sufficiency of Plaintiff's Notice of Billing Error

Associates argues in the alternative that even if Peter Belmont's claims qualify as a billing error, it had no obligation to respond to his letters because Belmont did not comply with the notice requirements of § 1666.

TILA provides that notice of a billing error satisfies the requirements of § 1666 when it is received by the creditor within sixty days after the creditor has sent the obligor a statement of his account and when in the notice, the obligor:

> (1) sets forth or otherwise enables the creditor to identify the name and account number (if any) of the obligor,
>
> (2) indicates the obligor's belief that the statement contains a billing error and the amount of such billing error, and
>
> (3) sets forth the reasons for the obligor's belief (to the extent applicable) that the statement contains a billing error.

15 U.S.C. § 1666(a).

■ Peter Belmont's May 13, 1998 "Notice of Billing Error" letter, which Associates received on May 19, 1998—well within the sixty-day period following the May 5, 1998, statement—(1) repeatedly stated his name and account number, and (2) indicated the reason he believed a billing error occurred, as well as (3) the amount of such error. *See* Gellhaus Aff., Ex. E. In point of fact, after examining Peter Belmont's letter (which is couched throughout in lan-

guage mirroring that of § 1666), it is doubtful that Associates has ever received a more perspicuous notice of billing error or one that adheres more closely to the requirements of § 1666.

Associates suggestion that plaintiff's letter was not recognizable as, and is not, a valid notice of billing error—despite the all-capitals heading on the first page which read "NOTICE OF BELIEVED BILLING ERROR AND REQUEST FOR DOCUMENTARY EVIDENCE OF CONSUMER INDEBTEDNESS"—appears to be simply a transparent, post-hoc excuse for its tardy and incomplete compliance with TILA. In this regard, it should be noted that there is absolutely nothing in the correspondence between Associates and Peter Belmont that suggests that defendant did not recognize Peter Belmont's May 13, 1998 letter, or either of his two, equally meticulous subsequent letters, for what they manifestly were: notices of billing error under § 1666.

Nonetheless, Associates contends that the plaintiff's May 13, 1998 letter did not indicate that he was disputing a particular charge or alleging a "particular billing error" and the amount of such error. *See* Def.'s Reply Mem. Supp. Summ. J. at 3. However, Peter Belmont's letter clearly indicates at several different points that he believed the amount of the billing error to be $1,895.49; indeed, the heading of the letter's second paragraph reads *"The amount for which I was billed, and which ENTIRE AMOUNT I believe to be erroneously billed, as to me, is: $1,895.49."* Gellhaus Aff., Ex. E, ¶ 2 (emphasis in original).

■ Finally, Associates contends that Peter Belmont's Notice of Billing error did not meet the requirements of § 1666(a) because it was not timely filed. Defendant argues that if the "Wrong–Person Error" is a billing error, the first statement that showed such an error was the January 1993 statement,[7] which postdated Peter

---

**7.** The January 1993 billing statement appears to be the first Associates statement addressed to Jeremy Belmont and Peter Belmont. *See* Mitchell Aff., Ex. A.

Belmont's April 1992 letter asking to be removed as a co-obligor on the account, but which still listed Peter Belmont as a holder of the account. Thus, Associates argues, to comply with § 1666(a), Peter Belmont's notice should have been mailed within sixty days of the January 1993 statement, not the May 1998 statement. *See* Def.'s Reply Mem. at 2–4. Associates's argument rests on the assertion that although the first statement Peter Belmont received was on May 5, 1998, he had constructive notice of the contents of the prior statements mailed to his son. *See id.* at 3.

Associates's argument overlooks the fact that Peter Belmont and his son did not share the same address in January 1993 or at any time thereafter; Peter Belmont's son was living in Massachusetts or California, while Peter Belmont lived in New York. Consequently, plaintiff would have no reason to know that his name appeared on Associates's statements. Further, the promptness of Peter Belmont's response once he actually received a statement from Associates[8] belies the notion that he had any knowledge that his name appeared on billing statements mailed to his son on earlier dates. Nor can it be found that Peter Belmont should have known that his name was on the statements sent to his son, for no duty to exercise reasonable diligence that could apply in these circumstances would require him to examine his son's mail—which was sent to addresses at which Peter Belmont never resided—in order to ascertain whether he was still listed as an addressee on billing statements pertaining to charges made by his son. Accordingly, even assuming that the statute allows for constructive notice, Peter Belmont did not have constructive notice of the contents of the pre-May 1998 statements, and his May 13, 1998 Notice of Billing error was, therefore, timely sent to Associates. In sum, then, plaintiff com-

plied fully with his obligations under § 1666.

**(2)**

The same, however, cannot be said of Associates. Once a creditor is on notice of a believed billing error, the Act requires that:

(A) *not later than thirty days after the receipt of the notice, [the creditor must] send a written acknowledgment thereof to the obligor,* unless the action required in subparagraph (B) is taken within such thirty-day period, and

(B) not later than two complete billing cycles of the creditor (in no event later than ninety days) after the receipt of the notice and prior to taking any action to collect the amount, or any part thereof, indicated by the obligor under paragraph (2) either -

(i) make appropriate corrections in the account of the obligor, including the crediting of any finance charges on amounts erroneously billed, and transmit to the obligor a notification of such corrections and the creditor's explanation of any change in the amount indicated by the obligor … and, if any such change is made and the obligor so requests, copies of documentary evidence of the obligor's indebtedness; or

(ii) send a written explanation or clarification to the obligor, after having conducted an investigation, setting forth to the extent applicable the reasons why the creditor believes the account of the obligor was correctly shown in the statement and, upon request of the obligor, provide copies of documentary evidence of the obligor's indebtedness.

15 U.S.C. § 1666(a)(3) (emphasis added).

In this case, Associates received Peter Belmont's first Notice of Billing Er-

---

**8.** Peter Belmont sent his first Notice of Billing Error on May 15, 1998, just ten days after the closing date listed on the May 1998 statement. Presumably, Peter Belmont did not receive the May 5, 1998 statement until at least a couple of days after the closing date. Thus, he responded in fewer than ten days after receiving the statement.

ror on May 19, 1998, *see* Pl.'s Decl. Opp'n, Ex. 2 (return receipt card), but did not send any correspondence to Peter Belmont regarding the notice until July 20, 1998—sixty-two days later. Associates's July 20, 1998 correspondence to Belmont consisted of two letters, the first of which appears to be a form response letter, while the second more directly responds to his notice(s) of billing error.[9] *See* Gellhaus Aff., Exs. F, G. On its face, defendant's response violates § 1666(a)(3)(A), which requires a creditor to acknowledge the receipt of a notice of billing error within thirty days.

In its defense, Associates contends: "Both letters were mailed to the plaintiff within ... [the] two complete billing cycle period allowed by 15 U.S.C. § 1666(a)(B) [sic]. Indeed, at least one was mailed within the 30 days required by 15 U.S.C. § 1666(a)(A) [sic]." Def.'s Mem. at 4. However, Associates's argument is again based on an untenable interpretation of the statute. Although it is true that Associates's July 20th correspondence came within two complete billing cycles of the May 5, 1998 statement, § 1666(a)(3)(B) states a requirement in addition to, not in lieu of, § 1666(a)(3)(A), which sets forth the 30–day written acknowledgment requirement.

Finally, Associates's defense that at least one letter was sent within the thirty-day period of § 1666(a)(3)(A) appears to be based on the fact that Associates's July 20th letters were sent within thirty days of Belmont's *second* Notice of Billing Error. However, the fact that Associates's response would have been timely as to Peter Belmont's *second* letter, does not excuse Associates for not responding to his initial notice until sixty-two days after it was received.

Moreover, even if the July 20th letters had been preceded by a timely acknowledgment of receipt of Peter Belmont's

May 13th notice, they still would not have complied with § 1666(a)(3)(B). Section 1666(a)(3)(B) is not satisfied simply by showing that the creditor sent any response at all to the notice of billing error; rather, it requires that the creditor either (1) make the appropriate corrections to the account, thereby remedying the billing error, or (2) send a written explanation or clarification, including copies of any documentary evidence requested. *See* 15 U.S.C. § 1666(a)(3)(B). Associate's July 20th correspondence did neither.

On this point, Associates contends that "one of the [response] letters ... provides a written explanation as to why defendant Associates believes the plaintiff was liable for the undisputed charges on the account. This is all that is required by 15 U.S.C. § 1666(a)(B)(ii) [sic]." On the contrary, what is required by § 1666(a)(3)(B)(ii) in this case is that "copies of documentary evidence of the obligor's indebtedness" be provided in accord with plaintiff's request. 15 U.S.C. § 1666(a)(3)(B)(ii). No such documentation was provided with the July 20th letters, and while it may be that the pertinent documentary evidence rested with Boatmen's or some other prior holder of the account, even that would not release Associates of its statutory obligation. Therefore, Associates did not comply with the "procedure upon receipt of notice [of billing error] by creditor" prescribed by § 1666(a)(3).

■ Nonetheless, Associates argues that even if their response letters were not sufficient for timely compliance with § 1666, it still has established a good faith defense under 15 U.S.C. § 1640(f). *See* Def.'s Mem. at 4. Section 1640(f) states that no liability under the Act shall apply "*to any act done or omitted in good faith in conformity with any rule, regulation, or interpretation thereof by the [Federal Reserve] Board.*" 15 U.S.C. § 1640(f); *see*

---

9. While both letters are signed by Patrick J. Wilson, the first clearly has a facsimile signature (likely a computer font), *see* Gellhaus Aff., Ex. F, whereas the second is hand-signed

and notifies Peter Belmont as to when the account was opened and states that Associates could not provide a copy of the original credit application, *see id.*, Ex., G.

*Turner v. General Motors Acceptance Corp.*, 180 F.3d 451, 455 (2d Cir.1999); *Kessler v. Associates Financial Servs. Co.*, 573 F.2d 577, 579 (9th Cir.1977); *Pennino v. Morris Kirschman & Co.*, 526 F.2d 367, 370 (5th Cir.1976). However, nowhere does Associates assert that it mistakenly relied on any rule, regulation or interpretation of the Federal Reserve Board in fashioning its response to plaintiff's Notice of Billing Error. Accordingly, Associates's argument under § 1640(f) has no merit.

Because Associates manifestly did not comply with the 30–day written acknowledgment requirement of § 1666(a)(3)(A) and because it has not established its entitlement to a good faith defense under § 1640(f), its actions in failing to respond to Peter Belmont's May 13, 1998 letter until July 20, 1998, constitute a violation of § 1666(a)(3).

### (3)

Peter Belmont also claims that Associates violated 15 U.S.C. § 1666a(a) and 12 C.F.R. § 226.13(d)(2) when it made or threatened to make an adverse credit report while his Notice of Billing Error remained unresolved. *See* Am. Compl. ¶ 17. Section 1666a provides that after a creditor receives a notice of billing error from an obligor under § 1666(a):

> [A] creditor or his agent may not directly or indirectly threaten to report to any person adversely on the obligor's credit rating or credit standing because of the obligor's failure to pay the amount indicated by the obligor ... and such amount may not be reported as delinquent to any third party until the creditor has met the requirements of section 1666....

15 U.S.C. § 1666a(a); *see also* 12 C.F.R. § 226.13(d)(2) (paraphrasing § 1666a(a)).

 Peter Belmont alleges that Associates threatened his credit rating during

the pendency of his billing error dispute in its letters dated June 25, 1998 and July 22, 1998. *See* Pl.'s Decl. Opp'n at 4–5. On June 25, 1998, Associates, despite having received Peter Belmont's Notice of Billing Error on May 19, 1998, wrote: "Do not allow this situation to become more serious. Protecting your credit is important to you both today and in the future." *Id.*, Ex. 3. Then, on July 22, 1998, after having received two additional notices of billing error that reported the same believed billing error, but before it had complied with its obligations under § 1666(a)(3)(B)(ii) to provide plaintiff with the documentary evidence he requested, Associates sent another letter to Peter Belmont that contained the same warning. *See id.* Finally, while all three notices of billing error remained outstanding, Associates notified a credit agency, Trans Union, of Belmont's allegedly delinquent payments. *See id.*, Ex. 4.[10] It is, therefore, clear that Associates made an adverse credit report during Peter Belmont's pending billing error dispute.

Associates proffers no explanation or defense, other than those discussed and found unavailing above, *see supra* Discussion § (2), for its actions with respect to Peter Belmont's credit rating. Because Associates's two letters constitute implicit threats to Belmont's credit rating, and the evidence indicates that Associates actually did make an adverse credit report to Trans Union after receipt of a valid notice of billing error, but before complying with its obligations under § 1666(a)(3), Associates violated § 1666a.

### (4)

 Finally, Associates argues that if Belmont was not obligated on the account (as he at one time claimed and possibly still does claim), then he is not eligible for the protections accorded to "obligor[s]"

---

**10.** The Trans Union credit report noted that it had been updated in June 1998. *See id.* In addition, the Trans Union report listed the account balance as $1,988 and the past due amount as $218, both sums being greater than those listed on the billing statement for the period ending May 5, 1998 that Peter Belmont contested in his notices of billing error. *Compare id., with id.*, Ex. 1.

by 15 U.S.C. §§ 1666–1666a. *See* Def.'s Reply Mem. at 2–4. Given the remedial nature of TILA, Congress's intent to protect consumers, and the courts' mandate that TILA be liberally construed, *see supra* Discussion § (2)(a), the term "obligor[s]" must necessarily be construed to include those whom the creditor claims are obligors, as well as individuals who are in fact obligors in the contract law sense. Otherwise, there would be a lacuna in the statute, and an important area in the statute's remedial scheme would be left unprotected. A consumer who believes that he is not obligated under a credit account, and promptly notifies the creditor of the mistake through a proper notice of billing error, deserves the broad protections that Congress intended under the Act.

The need for such protections are particularly illustrated by Associates's actions in this case and its ability to harm Peter Belmont's credit even if he is not an obligor and was not obligated to Associates at the time of the May 5, 1998 statement. Associates chose to treat Peter Belmont as if he were an obligor, threatened his credit and, indeed, was even able to carry out its threats, as evidenced by the Trans Union credit report which detailed adverse information about Peter Belmont. *See supra* Discussion § (3). Thus, whether or not Peter Belmont is actually obligated on the account has no bearing on whether he has standing to bring this action under TILA. Accordingly, Peter Belmont does have standing to bring this suit under TILA to the extent that he is alleging a "Wrong–Person Error."

### (5)

Having found that Associates violated TILA and that Peter Belmont has standing to invoke the Act's remedies, it is necessary to determine the appropriate TILA remedy.

 Defendants argue that even if violations occurred, Peter Belmont should not be awarded penalties under the Act. Associates argues that the penalty provision applicable under the facts of this case is 15 U.S.C. § 1666(e), which provides that a creditor who fails to comply with the requirements of § 1666 forfeits any right to collect on the amount contested in the notice of billing error or any associated finance charges, except that the amount forfeited is not to exceed $50. *See* 15 U.S.C. § 1666(e). As defendant would have it, if Peter Belmont's April 6, 1992 letter was insufficient to remove him from the account and he is deemed liable for the $1,895.49 or any other sum on the account, Associates, then, could collect whatever total sum was found due after $50 was subtracted in accord with § 1666(e). Associates, however, contends that because it has "forgiven" the $1,895.49 debt owed by plaintiff, "the plaintiff has already recouped any amount he may have been entitled to under these provisions." Def.'s Mem. at 5.

Associates's argument is flawed in two respects. First, it is not entirely clear whether Associates's letter of June 18, 1999 stating that "[n]othing is due," Gellhaus Aff., Ex. C, constitutes a binding forgiveness of debt. In light of defendant's argument, however, and to avoid unnecessarily reaching the question of whether Peter Belmont is still an obligor on the Associates account, Associates will be enjoined from collecting from Peter Belmont the first $50 on the account in accordance with § 1666(e).

Second, the forfeiture provision of § 1666(e) is not the sole remedy for Associates's violations in this case. Associates gives short shrift to the penalty provision of 15 U.S.C. § 1640(a)(2)(A) which provides a penalty of "twice the amount of any finance charge in connection with the transaction ... except that the liability ... shall not be less than $100 nor greater than $1,000" for violations of §§ 1666 and 1666a. 15 U.S.C. § 1640(a)(2)(A). Associates argues that Peter Belmont is not entitled to recoup a finance charge because he has not paid one. *See* Def.'s Mem. at 5.

██ The purpose of TILA, however, is not solely for plaintiffs to recoup finance charges wrongfully paid; rather, it is to assure that creditors comply with TILA's provisions, including those regarding the proper handling of billing errors. *See* 15 U.S.C. § 1601(a); *see also Mars v. Spartanburg Chrysler Plymouth, Inc.*, 713 F.2d 65, 67 (4th Cir.1983) (holding that although plaintiff suffered no actual injuries, § 1640 permits recovery of a statutory penalty equal to twice the amount of any finance charge in connection with the transaction); *Clausen v. Beneficial Fin. Co.*, 423 F.Supp. 985, 990 (N.D.Cal.1976) (holding that prevailing plaintiffs under § 1640 would be awarded twice the finance charges even though they did not show any actual damages); *In re Pittman*, 165 B.R. 586, 588 (Bankr.D.Md.1994) (holding that debtor was entitled to recover twice the finance charge although he showed no actual damages). The goals of TILA—to provide for prompt disclosure of the basis for charges and to enable consumers to resolve disputes without fear that the creditor will make adverse credit reports during the pendency of such disputes—would not be served if the only protection offered to consumers was that they were forgiven finance charges that they were never obligated to pay, or refunded finance charges that they should not have paid because they were erroneously billed. Thus, even if a particular obligor is incorrect in his belief that a billing error has occurred, he is still entitled under the Act to a prompt response from the creditor disclosing the basis of his liability. Indeed, the irrelevance of actual damages is what makes § 1640(a)(2)(A) a *penalty* provision. *See generally Murphy v. Household Finance Corp.*, 560 F.2d 206, 210 (6th Cir.1977) (holding "twice the finance charge" provi-

sion was intended by Congress as a means of achieving enforcement of the subchapter by encouraging private causes of action). Therefore, regardless of what Peter Belmont's obligor status is and regardless of whether he actually paid any finance charges, Peter Belmont is entitled to recovery of twice the finance charge in the transaction under the penalty provision of § 1640(a).[11]

In this case, when Associates erroneously billed Peter Belmont $1,895.49 on May 5, 1998, that amount included finance charges which had accrued over the history of the account for which it asserted Belmont was responsible as an obligor. The question thus becomes: What is the "finance charge in the transaction" under the facts of this case?

Federal Reserve Board regulations promulgated under TILA define a "finance charge" as "the cost of consumer credit as a dollar amount. It includes any charge payable directly or indirectly by the consumer and imposed directly or indirectly by the creditor as an incident to or a condition of the extension of credit." 12 C.F.R. § 226.4. Examples of finance charges include service, transaction, activity, and carrying charges, as well as interest on the line of credit. *See id.* § 226.4(b).

In order to calculate the finance charge, it is thus necessary to examine the nature of the relevant transaction. A credit card account is an "open-end credit" plan, which is defined as "a plan under which the creditor reasonably contemplates repeated transactions, which prescribes the terms of such transactions, and which provides for a finance charge which may be contemplated from time to time on the outstanding un-

**11.** Although Associates violated TILA on several occasions by continuing to send Peter Belmont billing statements after it received his notices of billing error and by threatening and then damaging his credit history, Peter Belmont is foreclosed by statute from recovering separate penalties for each violation *See* 15 U.S.C. § 1640(g); *Strange v. Monogram*

*Credit Card Bank Of Georgia,* 129 F.3d 943, 947 (7th Cir.1997) (holding that the proper penalty under § 1640 was double the finance charge on one monthly billing statement or the statutory minimum for failure to correct a billing error, although creditor made the same billing error without correction on six monthly statements).

paid balance." 15 U.S.C. § 1602(i). TILA regulations provide that "[f]or open-end credit, *transactions* means accounts, so that outstanding accounts are counted instead of individual credit extensions." 12 C.F.R. Pt. 226, Supp. I, ¶ 2(a)(17)(i)(4). Because Peter Belmont was allegedly obligated on such an open-end credit plan, it is thus necessary to calculate the finance charge on the outstanding account as a whole, rather than on individual charges on the account.

Taking into consideration that the account was fully paid, i.e., had a zero balance and no finance charges, from January 1994 until April 1995, see Mitchell Aff., Ex. A, it seems most reasonable to consider the finance charges accumulated on the account from April 1995 until May 1998, when the alleged billing error occurred, in calculating the applicable penalty. The total accumulated finance charges from April 1995 to May 1998 amount to $769.13.[12] See Mitchell Aff., Ex. A; Pl.'s Decl. Supp. Cross–Mot. at 7; Pl's Decl. Opp'n, Ex. 1. This accumulated total finance charge on the account, when doubled, exceeds the maximum of $1,000 allowed by § 1640(a). Therefore, the $1,000 maximum shall be granted to Peter Belmont as a penalty for Associates's failure to comply with §§ 1666 and 1666a.[13]

---

**12.** The yearly totals are as follows: 1995: $113.71; 1996: $212.51; 1997: $299.90; 1998: $143.01. *See* Mitchell Aff., Ex. A; Pl.'s Decl. Supp. Cross–Mot. at 7; Pl's Decl. Opp'n, Ex. 1.

**13.** Although there may be other methods for calculating the total finance charge on the account, there is no guidance in the case law on the particular issue presented by this case, and defendant has not offered an alternative analysis.

**14.** The Act's declaration of purpose states:
The Congress finds that economic stabilization would be enhanced and the competition among the various financial institutions and other firms engaged in the extension of consumer credit would be strengthened by the informed use of credit. The informed use of credit results from an awareness of the cost thereof by consumers. It is the purpose of this sub-

## (6)

Peter Belmont also seeks an award of reasonable attorney's fees pursuant to 15 U.S.C. § 1640(a)(3). *See* Am. Compl. at 6, ¶ c. Section 1640 provides that "in the case of any successful action to enforce the forgoing liability ... the costs of the action, together with a reasonable attorney's fee as determined by the court [shall be awarded]." 15 U.S.C. § 1640(a)(3). Although in his papers on this motion, Peter Belmont argues that because "[he] has not yet prevailed in this action ... the question of his right to seek attorney's fees is not yet ripe for decision," *see* Pl.'s Mem. at 18, a determination of his entitlement to costs and attorney's fees can be made without further briefing on the issue.

Although TILA is remedial legislation intended to protect consumers,[14] its attorney's fee provision does not extend to attorneys who bring claims as pro se litigants. While the issue of the availability of attorney's fees to a pro se attorney in TILA actions is another matter of first impression,[15] Supreme Court and appeals court precedents on similar fee-shifting provisions of other federal remedial statutes compels this result.

In *Kay v. Ehrler*, 499 U.S. 432, 111 S.Ct. 1435, 113 L.Ed.2d 486 (1991), the Supreme

chapter to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit, and to protect the consumer against inaccurate and unfair credit billing and credit card practices.
15 U.S.C. § 1601(a).

**15.** In *Strange*, the plaintiff was an attorney (not acting pro se) who had an associate from his firm represent him and he was awarded attorney's fees under TILA. *See Strange*, 129 F.3d at 946. However, the instant case can be distinguished from *Strange* both because Peter Belmont is a true pro se plaintiff who lacks any client-attorney relationship and because of the absence of independent counsel that Congress likely contemplated in drafting the attorney's fees provision.

Court addressed whether a prevailing pro se civil rights litigant who is also a lawyer could be awarded attorney's fees. After examining § 1988's legislative history, the Court held that a pro se attorney could not be granted legal fees because: (1) Congress likely envisioned an attorney-client relationship as the predicate for an award, *see id.* at 436, 111 S.Ct. at 1437; (2) "the overriding statutory concern is the interest in obtaining independent counsel for victims of civil rights violations," *id.* at 437, 111 S.Ct. 1435, S.Ct. 1438; and (3) awarding attorney's fees to pro se litigants, even those who are lawyers themselves, would create a disincentive to employ competent counsel whenever a plaintiff considered himself competent enough to litigate, *see id.* at 437, 111 S.Ct. 1435, 499 U.S. 439, 111 S.Ct. 1438, 113 L.Ed.2d 494. Similar reasoning and legislative history support the denial of attorney's fees in the instant case.[16]

The legislative history relied upon in *Kay* reveals that the attorney's fee provisions of the statute there at issue were intended to give aggrieved parties access to legal assistance so that their civil rights could be enforced:

"In many cases arising under our civil rights laws, the citizen who must sue to enforce the law has little or no money with which to hire a lawyer. If private citizens are to be able to assert their civil rights, ... then citizens must have the opportunity to recover what it costs them to vindicate these rights in court."

*Id.* at 437, 111 S.Ct. at 1437 (quoting S.Rep. No. 94–1011, at 2 (1976)). A House Report also relied on by *Kay* expressed similar sentiments:

"Because a vast majority of the victims of civil rights violations cannot afford legal counsel, they are unable to present their cases to the courts. In authorizing an award of reasonable attorney's fees, [this bill] is designed to give such persons effective access to the judicial process where their grievances can be resolved according to law."

*Id.* (quoting H. Rep. No. 94–1558, at 1 (1976)).

Similar concerns were expressed in connection with the enactment of the Consumer Credit Protection Act ("CCPA") of which TILA is a part, but with the additional proviso that primary responsibility for enforcement of the Act was to be accomplished through administrative channels. As stated in the House Report accompanying the CCPA:

[A]dministrative enforcement of the credit disclosure features of the bill is fundamental to its legislative purpose.... For the relatively unsophisticated consumer, particularly those of modest means, administrative enforcement will provide their only protection against unscrupulous merchants or lenders. Such consumers neither will have the means for instituting their own civil suit, nor adequate knowledge or experience to enable them to file a complaint through proper channels.... While primary enforcement of the bill would be accomplished under the administrative enforcement section ... further provision is made for the institution of civil action by an aggrieved debtor.

H. Rep. No. 1040 (1967), *reprinted in* 1968 U.S:C.C.A.N.1962, 1975–76.

**16.** The lower courts have likewise extended *Kay's* holding to a number of other statutes. *See Hawkins v. 1115 Legal Serv. Care,* 163 F.3d 684, 694 (2d Cir.1998) (holding that while a prevailing plaintiff in a § 1981 or Title VII action is ordinarily entitled to recover reasonable attorney's fees under 42 U.S.C. § 1988 or 42 U.S.C. § 2000e–5(k), respectively, a pro se plaintiff is not allowed to recover attorney's fees for representing herself, even if she is a lawyer); *SEC v. Waterhouse,* 41 F.3d 805, 808 (2d Cir.1994) (applying *Kay* and holding that pro se attorneys may not be granted fees under the Equal Access to Justice Act, 28 U.S.C. § 2412); *Giannetta v. Boucher,* No. 92–1488, 1992 WL 379416, 1992 U.S.App. LEXIS 33313, at*19 (1st Cir. Dec. 22, 1992) (applying *Kay* and holding that a pro se plaintiff shall not be entitled to attorney's fees under Fed.R.Civ.P. 37(a)(4)).

As his papers have shown, Peter Belmont clearly is not the unsophisticated consumer who needs counsel to properly file a complaint, and thus ensure enforcement. Rather, he had the means, knowledge and skill for instituting his own civil suit without the need to retain an outside attorney to commence competent litigation. Thus, he does not fall within the class of consumers with whom Congress, when it incorporated a fee-shifting provision into the Act, sought to protect.

Peter Belmont also somewhat misguidedly argues that he should be awarded fees because he "could not well have afforded to hire another attorney to conduct [litigation], unless on a contingent basis. But a contingent retainer is unlikely in a case like this." Pl.'s Mem. at 20. However, by providing for attorney's fees, which would presumably be calculated on the traditional lodestar basis, *see generally Savoie v. Merchants Bank,* 166 F.3d 456, 460 (2d Cir.1999) (discussing lodestar method of calculating attorney's fees), Congress provided private attorneys an incentive to take on TILA cases that is not dependent on the typically small recovery under the Act. Peter Belmont has, thus, not proffered an argument sufficient to overcome *Kay'* s rationale, and his request for attorney's fees is, therefore, denied.

█ There is, however, no corresponding case law limiting the availability of an award of costs under § 1640(a). Accordingly, Peter Belmont is entitled to an award of his costs in this action.

### Conclusion

Because Associates violated the provisions of 15 U.S.C. §§ 1666 and 1666a by failing to properly respond to plaintiff's timely Notice of Billing Error, and then by threatening to make, and in fact making, adverse credit reports while the billing dispute remained unresolved, defendant's motion for summary judgment is denied, and plaintiff's cross-motion for summary judgment is granted. In addition, plaintiff's request for an award of costs is granted, but his request for attorney's fees is denied.

Accordingly, defendant shall pay to plaintiff a penalty under 15 U.S.C. § 1640(a)(2)(A), in the maximum statutory amount of $1,000. In addition, if Peter Belmont is ever found to be responsible for any amount due on the Associates account, defendant is permanently enjoined, pursuant to the forfeiture provisions of 15 U.S.C. § 1666(e), from collecting or attempting to collect the first $50 of any such amount. Finally, defendant shall pay plaintiff's costs. The Clerk of the Court is directed to enter judgment accordingly and close the case.

and Jeremy Belmont, and adding that plaintiff became the primary cardholder on the account when Jeremy Belmont filed for bankruptcy. *See* Gellhaus Aff., Ex. G. The letter stated that Associates was unable to find a copy of the original application and further advised Peter Belmont that if he wanted a copy of the original application, he would have to contact Boatmen's. *See id.*