OPINION OF THE COURT
Michael A. Ciaffa, J.
This action by plaintiff, Costco, alleges that defendants defrauded Costco in connection with the purchase and return of a $5,000 engagement ring. When defendants failed to appear for a scheduled trial, the court set the matter down for an inquest on damages. Proof of plaintiffs damages was submitted, in the first instance, by affidavit and supporting documents (see Uniform Civ Rules for Dist Cts [22 NYCRR] § 212.32 [b]). However, upon application of defendant Kristen Rendina, the inquest was reopened, and further evidence was taken from Rendina and from a Costco supervisor (Shevon Cunningham). Throughout the inquest, defendant Salvatore Lume neither appeared nor contested plaintiffs proof of damages. (See accompanying decision respecting plaintiffs claim against defendant Lume.)
Costeo’s evidence at the inquest establishes that defendants purchased a $5,000 engagement ring for Rendina at a Costco store in Lawrence in June 2008. The purchase, totaling $5,431.24 (tax included), was initially made through credit card charges on their separate American Express credit cards. Rendina’s card was charged $3,431.24. The balance ($2,000) was charged to Lume’s card.
Due to a cashier’s error, the transaction was mistakenly recorded under another customer’s Costco account number. Upon *471 learning of the error, defendants complained that the mistake would deprive them of the ability to obtain a 2% Costco rebate.
After a supervisor became involved, Costco attempted to resolve the problem in several ways, which included voiding the transaction and reprocessing it as a new purchase on defendants’ American Express cards. According to Rendina, she called American Express and was advised that such a repurchase could not be effected the same day. Since it would take a day or so to process a request to void the initial charges, Rendina would have to come back another day to conclude the purchase. She was unwilling to do so. Other alternatives were proposed: One involved issuing Rendina a “store credit” which she could use to repurchase the ring. Another involved issuance of a Costco “cash card” which could be used like a store credit to effect a repurchase. Neither alternative was acceptable to Rendina. Neither would enable her to obtain a full refund if she should decide to return the ring to Costco.
Ultimately, defendants left the store with the ring and a “cash” receipt, signifying a “cash” purchase. The following day, defendants purchased a different engagement ring at a different Costco store in Brooklyn. The second purchase was properly credited to Rendina’s Costco account and was later paid for, without dispute. In the meantime, the first ring was returned to the other Costco store in Brooklyn, and after Costco verified that the ring had not been altered, a cash refund was given to Rendina.
Subsequently, the credit card charges from the original purchase were billed to defendants by American Express. Defendants promptly contested the charges with American Express. After receiving submissions from Rendina, Lume, and Costco, the disputes were resolved in defendants’ favor, and they were given “permanent” credits to their American Express accounts. Costco thereafter requested a further review of the matter. The result was the same.
Plaintiffs central claim in this lawsuit, as amplified by the supervisor’s testimony at the inquest, is that the defendants did not really pay cash for the ring. Instead, the sale was recorded as a “cash” sale as an accommodation for Costco’s unhappy customers.
Significantly, Costco’s supervisor acknowledged that defendants had the ability to obtain a legitimate “cash” refund when the ring was returned, using the “cash” receipt. However, he maintained that defendants remained responsible, in such event, *472 for paying the American Express charges. According to the supervisor’s testimony, once Rendina obtained the refund, defendants should have used it to pay American Express. Instead, defendants contested the charges, and in Costco’s view, they wrongly prevailed in that dispute. Consequently, Costco alleges that it lost $5,431.24 due to defendants’ fraudulent actions.
Rendina’s testimony, in contrast, was that defendants actually paid cash for the ring, as the “cash” receipt indicates. After the initial transaction had been voided, Rendina claimed that the cash was retrieved from Lume’s car, and used to purchase the ring. Consequently, upon the ring’s return, a “cash” refund was properly paid to Rendina, and she did nothing wrong in subsequently contesting the American Express charge for the purchase.
Notwithstanding Rendina’s initial default when the matter was calendared for trial, she was entitled to present her version of the events as a defense to plaintiffs claimed damages. Under well settled precedent, Rendina could give testimony and present evidence “involving circumstances intrinsic to the transactions at issue that, if proven, will be determinative of the plaintiffs real damages, which cannot be established by the mere fact of the defendant[s’] default.” (See Rokina Opt. Co. v Camera King, 63 NY2d 728, 730-731 [1984].) Like the circumstances presented in Rokina Opt., testimony and evidence respecting “alleged payments made and credit[s] earned” may properly be presented by Ms. Rendina, and considered by the court, in determining plaintiffs entitlement to damages against her. (Id. at 731.)
Rendina’s testimony, and the testimony of Costco’s supervisor, Cunningham, presented diametrically opposing descriptions of the events immediately preceding issuance of the “cash” receipt. If Rendina is to be believed, her then fiancé, defendant Lume, had saved up more than $5,400 for purchasing the ring, the cash had been left in their car when they originally purchased the ring using charge cards, and the cash was retrieved and used to conclude the purchase after the original transaction was voided and other alternatives proved unacceptable.
If the supervisor is to be believed, without receiving any cash from defendants, he knowingly issued a “cash” receipt to mollify a distraught Rendina, in the expectation that Rendina and Lume would pay off the existing American Express charges *473 with any “cash” refund they might obtain upon a return of the ring. He then temporarily “borrowed” more than $5,400 from Costco’s vault to reconcile the amount of cash in the cash register where the transaction was recorded, believing all the while that he was creatively solving an unusual customer relations problem that emanated from a cashier’s error.
Ordinarily, such a dispute would require a determination whether one version of the events or the other is more credible. However, upon closer examination of the proof, this case presents a more fundamental threshold legal issue — whether the American Express determination of Rendina’s credit card charge dispute collaterally estops plaintiff from pursuing a damage claim against her in the instant proceeding. Collateral estoppel is an affirmative defense (CPLR 3018 [b]) which a defendant must plead and prove. Rendina’s pro se answer plainly raised the issue. She asserted: “I committed no wrong doing — American Express investigated my case several times and they decided that my dispute was correct.”
The basic principles are well settled. “The doctrine of collateral estoppel bars ‘a party from relitigating in a subsequent action or proceeding an issue clearly raised in a prior action or proceeding and decided against that party or those in privity, whether or not the tribunals or causes of action are the same.’ ” (Chiara v Town of New Castle, 61 AD3d 915, 916 [2d Dept 2009], quoting Ryan v New York Tel. Co., 62 NY2d 494, 500 [1984].) Two conditions must be met: first, “the issue sought to be precluded [must be] identical to a material issue necessarily decided . . . in a prior proceeding,” and second, the losing party must have been afforded “a full and fair opportunity to contest this issue” in the prior proceeding. (Chiara v Town of New Castle, 61 AD3d at 916, quoting Jeffreys v Griffin, 1 NY3d 34, 39 [2003].)
The proponent of collateral estoppel bears the burden, in the first instance, of showing identity of the issues. (Jeffreys v Griffin, 1 NY3d at 39.) On the other hand, the opponent carries the burden of demonstrating “the absence of a full and fair opportunity to litigate” the issue in the prior proceeding. (Id.)
Moreover, it is well settled, today, that collateral estoppel does not require a prior ruling by a judicial tribunal. Under modern practice, decisions made in a “prior proceeding” can be deemed binding even when made through “administrative determinations” which “rested solely on written documents . . . without a hearing of any type.” (See Jay Carlisle, Getting a Full Bite of *474 the Apple: When Should the Doctrine of Issue Preclusion Make an Administrative or Arbitral Determination Binding in a Court of Law?, 55 Fordham L Rev 63, 81 [1986] [discussing Brugman v City of New York (64 NY2d 1011 [1985])].) The same holds true of “issues resolved by arbitration.” (See Kilduff v Donna Oil Corp., 74 AD2d 562, 563 [2d Dept 1980].)
In such contexts, however, a court must be careful to apply collateral estoppel rules “more flexibly.” (Allied Chem. v Niagara Mohawk Power Corp., 72 NY2d 271, 276 [1988].) Through a “multifaceted inquiry” a court needs to examine whether the first decision maker had the authority “to act adjudicatively,” and if so, whether the procedures used “assured that the information presented . . . [was] sufficient both quantitatively and qualitatively, so as to permit confidence that the facts asserted were adequately tested, and that the issue was fully aired.” (Id. at 276-277.) Additionally, a court should consider “the expectation of the parties” to the earlier proceeding. (Id. at 277.) A party who “fully participates” in a proceeding in the expectation that it “will be bound by the result” may be “fairly precluded from relitigating the issue in a subsequent proceeding.” (Id.)
Applying these principles, the testimony and evidence adduced at the inquest provides a strong factual and legal basis for Rendina’s collateral estoppel defense. The dispute heard by American Express involved precisely the same issue — whether defendants actually paid cash for the ring that was later returned for a cash refund.
Documentary proof from Costco confirms that American Express was asked to reject Rendina’s dispute on the very same ground. According to Costco’s own record of the “general dispute” heard by American Express, its customers (Rendina and Lume) claimed that they made “payment in cash” for the ring, but were “also charged on their credit card[s].” “They returned the ring and got cash refund.”
In the face of Rendina’s complaint that defendants had not received credit to the credit cards, American Express advised Costco “[o]ur mutual customer requests credit for this billing as payment was made directly to your establishment. Please issue full credit or provide signed itemized support and explain why credit is not due.” Costco responded by making the following comments:
“the member’s Amex was charged then she was given a cash card refund which is a store credit. The *475 card was cash out within 15 minute and the member was given $5431.24 in cash which was used to repurchase the item. On 6/20/08 the member returned the item at our Brooklyn location and was given a cash refund. The member was not given Amex credit because they received all there refunds in cash. Copies of all the transactions are being faxed. No further refund or credit is due to this member.”
Notably, Costco’s supervisor’s testimony at the inquest differed, in several material respects, from the explanation provided to American Express by Costco. The initial explanation offered by Costco, on its face, was not convincing and was contradicted by Costco’s own evidence. While the supervisor’s testimony at inquest was clear and consistent and was generally more believable, Costco failed to submit a statement from the supervisor to American Express. Most importantly, Costco made no effort to demonstrate at the inquest that it was deprived of a full and fair opportunity to contest Rendina’s claim before American Express.
To the contrary, it appears that the dispute was considered, fully and fairly, over a period of several months by American Express. In the course of Rendina’s initial dispute and Costco’s request for reexamination of its claim, Costco was afforded ample opportunity to contest Rendina’s claim. Both inquiries reached the same result — American Express issued a credit to Rendina in her favor, and Costco’s account was debited and adjusted with respect to the contested credit card charge.
Should such a determination be deemed conclusive and binding? The court has found no cases which directly address the question. But upon close examination of American Express’s claims resolution process, the court concludes that the result is, indeed, binding under collateral estoppel principles.
First and foremost, it is clear that American Express performed its investigation, and made its determination, in accordance with federal law. Under a federal statute commonly known as the Federal Fair Credit Billing Act (FCBA) (15 USC § 1666 et seq.), American Express acted “adjudicatively” using procedures which “qualitatively and quantitatively” resulted in an informed decision of an issue that was “fully aired.” It apparently did so pursuant to written policy guidelines governing merchant charge-backs, credits, and adjustments, which govern complaints and disputes made by credit card customers under *476 the FCBA (15 USC § 1666 et seq.). (See generally American Express Operating Procedures for U.S. Merchants, www.tax.ny.gov/pdf/evta/amex_operating_guide.pdf; The American Express Inquiry and Chargeback Policy and Procedure Guide for Merchants, www.osc.nc.gov/secp/Exhibit2-AmexInquiryChargebackGuide09272005univers.pdf.)
The FCBA “seeks to prescribe an orderly procedure for identifying and resolving disputes between a cardholder and a card issuer as to the amount due at any given time.” (See Gray v American Express Co., 743 F2d 10, 13 [DC Cir 1984].) The “chief purpose” of the FCBA is “to help consumers resolve credit billing disputes promptly and fairly.” (See Jacobs v Marine Midland Bank, 124 Misc 2d 162, 166 [Sup Ct, Orange County 1984].) Toward that end, the American Express Policy and Procedure Guide for Merchants, cited above, makes plain that timely and complete responses to charge card customer inquiries and disputes are “absolutely essential” to the dispute resolution process. (See The American Express Inquiry and Chargeback Policy and Procedure Guide for Merchants at 6, www.osc.nc.gov/secp/Exhibit2-AmexInquiryChargebackGuide09272005univers.pdf, op. cit.)
Under the FCBA’s provisions, a consumer typically may contest a credit card charge by giving written notice to the credit card issuer within 60 days of issuance of an account statement containing a disputed credit card charge. (See 15 USC § 1666 [a].) Rendina unquestionably did so. If such notice is provided, the credit card issuer by law “must investigate the matter and either make appropriate corrections in the [cardholder’s] account or send a written explanation of its belief that the original statement sent to the [cardholder] was correct.” (Gray v American Express Co., 743 F2d at 14, quoting American Express Co. v Koerner, 452 US 233, 237 [1981].)
If the card holder fails to assert the existence of an alleged billing error until after such 60-day period has elapsed, the card issuer’s federal law duty to investigate and resolve the dispute under the FCBA will not be triggered. (See e.g. Durso v J.P. Morgan Chase & Co., 27 Misc 3d 1212[A], 2010 NY Slip Op 50686[U] [Civ Ct, Richmond County 2010].) In such circumstances, “a cardholder’s failure to exercise this right does not eliminate his or her ability to dispute the charge in a subsequent collection case.” (Capital One Bank [USA], N.A. v Denboer, 791 NW2d 264, 272 [Iowa Ct App 2010].)
On the other hand, the court sees no good reason why the parties to a dispute heard pursuant to the FCBA should not be *477 bound by the result. As a matter of law, and sound public policy, resolution of such disputes under the FCBA should be encouraged. Rendina exercised her right to contest the charge in a lawful manner. Costco responded and American Express made a determination that was intended to be binding on both of them.
At least in circumstances where a credit card customer presents a timely dispute to the card issuer, contesting liability for a merchant’s charge to the customer’s account, and the customer prevails, that decision ought to be conclusive. In the absence of proof from the merchant establishing that it was not afforded a full and fair opportunity to contest the customer’s claim, it cannot seek a second bite at the apple. Accordingly, the court concludes that Costco is collaterally estopped from relitigating Rendina’s liability in this proceeding.
In reaching this conclusion, the court is mindful that merchants can lose cardholder disputes under the FCBA without having a chance to submit live witness testimony. Given the testimony and evidence presented at the inquest, a factfinder could have rationally decided the issue differently. But on balance, that possibility is not dispositive. Under the circumstances presented, the proof at inquest confirms that the issue of Rendina’s liability was fairly heard and decided by American Express. Rendina owes Costco nothing more.